[No. D024647. Fourth Dist., Div. One. Feb. 11, 1998.]

LOURDES G. McMANIS, Plaintiff and Appellant, v.
SAN DIEGO POSTAL CREDIT UNION, Defendant and Appellant;
LIFE INVESTORS INSURANCE COMPANY et al., Defendants and
Respondents.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Discussion section, parts I.A.2., I.A.3., I.B., I.C., II and III.

548

549

## COUNSEL

P. Robert Philp, Jr., and J. Jason Hill for Plaintiff and Appellant.

Johnson & McCarthy, Daniel B. McCarthy and John Evan Edwards for Defendant and Appellant.

Kopesky & Welke, Richard P. Tricker, Radcliff, Brestoff, Frandsen, Tricker & Dongell and Glenn M. White for Defendants and Respondents.

## OPINION

**HALLER, J.**—The San Diego Postal Credit Union (Credit Union) loaned Lourdes G. McManis money to purchase an automobile. At the same time,

Credit Union sold Lourdes a disability credit insurance policy issued by Life Investors Insurance Company (Life Investors). After making her loan and insurance payments for three years, McManis became disabled and was unable to continue making the payments on her loan. McManis filed a disability claim with Life Investors and, while the claim was pending, Credit Union repossessed her vehicle. As a result of the repossession, McManis allegedly suffered emotional distress and property damage.

McManis sued Credit Union and Life Investors. Thereafter, Life Investors paid McManis's disability claim in full and Credit Union returned her vehicle. McManis later amended her complaint to add the company that repossessed the vehicle, San Diego Auto Recovery, Inc. (Auto Recovery), as a Doe defendant. Defendants moved for summary judgment. McManis opposed the summary judgment and moved to amend the complaint. After permitting McManis to file supplemental papers, the court granted summary judgment and denied the motion to amend.

McManis appeals. In the published portion of this opinion, we hold the summary judgment was improper as to Credit Union because the parties' loan agreement permitted the credit union to repossess only if "permitted by law" and the credit union did not show it complied with applicable law governing credit disability insurance. (Civ. Code, § 1812.400 et seq.) In the unpublished portion of the opinion, we determine the court properly granted summary judgment as to Life Investors and Auto Recovery, and conclude the court did not abuse its discretion in denying McManis's motion to amend. Since Credit Union is no longer a prevailing party, we need not reach Credit Union's cross-appeal that the court erred in denying its request for attorney fees.

## FACTUAL AND PROCEDURAL BACKGROUND

Viewing the summary judgment record in the light most favorable to McManis, the evidence before the trial court established the following.

In July 1990, McManis, a postal employee, applied for a $9,665 loan from Credit Union to buy a used vehicle. McManis agreed to make bimonthly payments for four years until July 1994. In connection with the loan application, Credit Union asked McManis whether she wanted to buy credit insurance issued by Life Investors that would protect her if she became disabled and was unable to make her loan payments. McManis agreed to purchase the disability insurance policy and checked the appropriate box on the loan agreement form. After Credit Union approved the loan, McManis granted Credit Union a security interest in the vehicle. During the next three

years, McManis's payments on the loan and on the disability insurance policy were automatically deducted from her payroll account.

At the end of 1992, McManis became pregnant. On June 24, 1993, a doctor diagnosed McManis with preterm labor and said she should not return to work. On that date, McManis called Credit Union and said she was going to be disabled for at least two months and that she needed to file an application for disability benefits for the car loan. The Credit Union employee told McManis she would have to wait until she was "off work" for 30 days. The employee said " '[o]nce you have 30 days completed, call us back, and then we'll take care of it.' " McManis responded " 'Can I call them so they can send me the form so I can get started on this?' " The employee answered " 'No, you have to wait 30 days, and then we'll take care of it.' " When McManis expressed concern, the Credit Union employee said, " 'Don't worry about it. If you get behind in your payments and your name comes up in the computer, it will show that you have a claim, and you won't have a problem. There will be no problems.' "

Thirty days later, on July 24, McManis called the Credit Union to request disability benefits. In response, Credit Union faxed Life Investors a notice that McManis had reported a total disability. The notice stated that McManis's reported disability began on June 24, 1993.

About one week later, McManis received a claim form from Life Investors. The claim form contained three parts: the employee's statement, the employer's statement, and the doctor's statement. On August 3, McManis completed the employee's portion and sent the claim form to her employer.

On August 13, McManis made the last payment on her loan. On August 20, McManis delivered her baby. Approximately 10 days later, on August 30, McManis's Credit Union loan went into default.[2]

Within one or two weeks, Credit Union's collection officer, Joel Blouin, began making phone calls to McManis, notifying her the loan was delinquent. McManis told Blouin she had a claim pending with the disability insurer. Blouin responded " 'We don't care. You have to pay us.' " In an effort to avoid the repossession, McManis retained a bankruptcy attorney and, on September 17, filed for chapter 7 bankruptcy.

For reasons not entirely clear in the record, McManis's disability claim form remained with McManis's employer (the United States Postal Service).

---

[2]Neither party produced evidence as to the precise date of the default. The parties have assumed August 30 was the default date. For purposes of summary judgment, we will do the same.

Although McManis had sent the claim form to the postal service's personnel manager in early August, the manager did not act upon it for several months because she was apparently waiting to know when McManis was returning to work. On October 7, the manager finally completed the claim form and returned it to McManis. One or two weeks later, McManis forwarded the claim form to her doctor at Kaiser-Permanente Medical Care, Dr. Richard Block. On October 28, Dr. Block completed the doctor's statement portion and sent the form to the Life Investors claims office.

On November 4, the Life Investors claims office (located in Atlanta, Georgia) received the claim form. In the claim form, Dr. Block confirmed McManis was "continuously" and "totally" disabled from June 24, 1993, through "six weeks post partum." Dr. Block said he began treating McManis on July 16, 1993.

Eleven days later, on November 15, McManis called Life Investors and spoke with the person handling her claim, Joseph Clark. McManis asked Clark about the status of her claim. Clark said he was "working on it."

The next day, on November 16, Clark wrote a letter to McManis stating that before he could process the claim he needed written verification that McManis had been under a physician's care for three weeks before she saw Dr. Block (from June 24, 1993, through July 16, 1993). Clark, however, did not question the information showing McManis was totally disabled from July 16 through "six weeks post-partum." Clark enclosed a form to be completed by McManis's doctor. The letter concluded "After we have received this information, we will be pleased to give your claim our prompt attention." On that same date, Clark informed Credit Union that McManis had returned her claim form and Life Investors had requested the additional medical information.

On about November 20, McManis received Clark's letter. McManis telephoned Clark and told him it was important that her claim be paid because Credit Union was threatening to take her car.

On December 7, the Kaiser physician who had treated McManis before July 16 (Dr. Albert Ray) completed a claim form stating he began seeing McManis on November 15, 1992. Dr. Ray said McManis was disabled from June 24, 1993, through January 2, 1994. Dr. Ray sent the form to Life Investors.

Also on December 7, Credit Union obtained an order on its uncontested November 5 motion giving it relief from the bankruptcy stay, permitting it to enforce its lien upon McManis's vehicle.

Three days later, on December 10, Life Investors paid benefits for the period July 16 through August 20. For reasons not clear on the record, Credit Union did not receive this payment until after December 15.

On December 15, five days after Life Investors made the partial payment, Credit Union authorized Auto Recovery to repossess McManis's car. Later that day, two men from Auto Recovery arrived unannounced at McManis's home. While the men were in the process of taking the vehicle, McManis telephoned Blouin and told him the "insurance [had] already begun to pay." Blouin refused to lift the repossession order or call Life Investors to confirm the payment.

On that same date, McManis received another claim form from Life Investors pertaining to any further disability claims. McManis completed the claimant's portion of the form, stating that her doctor had extended her disability leave to January 3, 1994. That day (December 15), McManis sent the form to her doctor.

On December 16, Life Investors paid benefits for the period June 24 through July 16. Credit Union received that payment on December 21, 1993.

After her car was repossessed, McManis told Credit Union "how badly [she] needed [her] car" and that it was her only method of transportation. Credit Union personnel refused to discuss the matter with McManis.

On December 30, Life Investors paid benefits for the period August 20 to December 15. However, on January 3, 1994, Life Investors informed Credit Union that this payment had been made in error and requested Credit Union to return the money because the payment had been made before its investigation had been completed. Credit Union returned the payment.

On January 4, Life Investors wrote a letter to McManis stating it had received McManis's second claim form, and it was obtaining additional information from Dr. Ray regarding McManis's postpregnancy disability. The letter stated that once that information was received, it would "review McManis's [second disability] claim for possible benefits." Ten days later, on January 14, McManis's doctor, Dr. Ray, faxed Life Investors information confirming that McManis had a continuing disability.

During the next week, McManis called Life Investors and spoke with Clark several times. Clark acknowledged receiving Dr. Ray's fax, but said that he needed further information and questioned whether the information he had received was authentic. Clark said he was requesting better copies of

the medical records. After he received further information, Clark said the claim would be paid.

One or two days later, McManis spoke with Linda Bailey, a Life Investors manager. Bailey said the remaining claim benefits were going to be sent on January 24. McManis then called Credit Union and asked whether it would return her car. Credit Union refused.

On January 26, Credit Union sent McManis a letter stating she owed $2,793.90 plus accrued interest.

On February 7, McManis called Life Investors to ask why it had not paid the claim. Bailey responded that "Clark and the Credit Union are trying to credit the money where it belongs." Bailey said the Credit Union had said it was refusing to return the car because McManis had previously been delinquent in her payments. There was no evidence McManis had ever before been delinquent in her payments.

On that same date, McManis filed a complaint, in propria persona, against Credit Union and Life Investors, in an attempt to compel Credit Union to return her car. As against Credit Union, McManis alleged (1) declaratory relief (seeking return of her vehicle); (2) breach of contract; (3) breach of covenant of good faith and fair dealing; and (4) intentional infliction of emotional distress. As against Life Investors, McManis alleged breach of the covenant of good faith and fair dealing.[3]

Three weeks later, on approximately February 28, 1994, Credit Union returned the car to McManis.[4] McManis nonetheless continued her lawsuit against Credit Union and Life Investors to recover for damages caused by the repossession. The trial was scheduled for February 10, 1995.

One month before the trial, in January 1995, McManis retained an attorney. The parties stipulated to a three-month continuance to permit McManis's attorney to conduct discovery and prepare for trial. The new trial date was scheduled for June 16, 1995. After discovery commenced, McManis served Auto Recovery as a Doe defendant.

In April and May 1995, defendants filed summary judgment motions. McManis opposed the motions and moved to amend the complaint. The

---

[3]McManis also alleged breach of statutory duty (Ins. Code, § 790.03, subd. (h)), but has since withdrawn that claim.

[4]The record is not clear as to when Credit Union received the funds from Life Investors to bring the loan out of default.

court ultimately granted summary judgment as to all parties and denied McManis's motion to amend.

## DISCUSSION

### I. *Summary Judgment*

A summary judgment motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) ■ A moving defendant must "prove an affirmative defense, disprove at least one essential element of the plaintiff's cause of action [citations] or show that an element of the cause of action cannot be established [citations]." (*Sanchez* v. *Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461, 1465 [55 Cal.Rptr.2d 415].) "The defendant 'must show that under no possible hypothesis within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial.' " (*Ibid.*)

If the defendant makes such showing, the court must look at the plaintiff's papers to determine whether they "demonstrat[e] the existence of a triable, material factual issue. . . ." (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1065 [225 Cal.Rptr. 203].) "Counter-affidavits and declarations need not prove the opposition's case; they suffice if they disclose the existence of a triable issue." (*Ibid.*)

Applying these principles, we review the record de novo to determine whether each defendant met its burden to show it is entitled to judgment as a matter of law, and if so, whether McManis produced facts demonstrating the existence of a triable material factual issue.

### A. *McManis's Claims Against Credit Union*

#### 1. *Breach of Contract*

■ In her complaint, McManis alleged Credit Union breached its contract by wrongfully repossessing, and then refusing to return, her vehicle.[5] Credit Union moved for summary judgment arguing the undisputed facts showed (1) on the date of repossession (December 15) McManis's loan was

---

[5]Although McManis (who filed the complaint without an attorney's assistance) did not expressly allege "wrongful repossession," the allegations can fairly be construed to include such claim. In moving for summary judgment, Credit Union conceded that McManis's second cause of action for breach of contract was "based on wrongful repossession."

in default; and (2) the loan agreement between Credit Union and McManis (the Agreement) allowed Credit Union to repossess the vehicle on default.

On our review of the record, we conclude Credit Union failed to establish it was entitled to repossess McManis's vehicle under the Agreement and therefore Credit Union failed to meet its burden on summary judgment.

The Agreement provides a loan is in "Default" if the borrower fails "to make any payment or perform any obligation" or if the borrower is "involved in any bankruptcy . . . proceeding . . . ." The Agreement then sets forth the circumstances under which Credit Union may repossess the security: "Upon any occurrence of Default, *and to the extent permitted by law*, the entire balance of Your loan shall be immediately due and payable . . . . If the entire balance is not paid immediately upon Default, *and if permitted by law*, the Collateral shall be voluntarily surrendered . . . . If this is not done, *to the extent permitted by law*, the Credit Union may enter the premises where the Collateral is located and take possession of it . . . ." (Italics added.)[6] Thus, under the Agreement's express terms, Credit Union was entitled to repossess the vehicle if (1) the loan was in default, and (2) the repossession was "permitted by law."

Credit Union established the loan was in default on December 15, since it had not received the full amount due by that date. Credit Union, however, did not proffer any factual basis for finding the repossession was "permitted by law," specifically by the particular statutes governing a lender's right to repossess a security while a disability claim is pending—Civil Code section 1812.400 et seq. (the Act).[7]

The Act prohibits a lender that has participated in supplying disability insurance to a borrower from pursuing certain collection actions and requires

---

[6] The Agreement's collection provision states in full: "Upon any occurrence of Default, and to the extent permitted by law, the entire balance of Your loan shall be immediately due and payable, without prior notice or demand, and you understand that interest will continue to accrue at the Simple Interest Rate shown on the reverse side. If the entire balance is not paid immediately upon Default, and if permitted by law, the Collateral shall be voluntarily surrendered to the Credit Union at a time and place acceptable to it. If this is not done, to the extent permitted by law, the Credit Union may enter the premises where the Collateral is located and take possession of it and the Credit Union may assert the defense of a superior right of possession as the holder of a security interest to any offense of alleged wrongful taking and conversion. The Credit Union may sell or dispose of the Collateral in any manner permitted by law, and any resulting deficiency on Your loan shall be immediately paid to the Credit Union. To the extent permitted by law, the Credit Union shall be reimbursed for all its costs and expense, including reasonable attorney fees, incurred in the course of collecting any amounts owed under this Agreement or in the recovery of any Collateral. If permitted by law, the Credit Union shall have the right to impress and enforce a lien upon the shares and dividends of any member indebted to it, and the Credit Union may set off the mutual indebtedness."

[7] Civil Code section 1812.402 provides in relevant part:

the lender to make specific disclosures. (§ 1812.402.) Certain provisions are of particular relevance here. First, if the debtor files a disability claim, the creditor may not invoke any creditor's remedy (defined to include "repossession" and "the commencement of any action or special proceeding") against the debtor for three months after the loan goes into default. (§ 1812.402, subd. (a).) Second, during the three months after default, if the disability insurer rejects or partially accepts the claim, the lender must provide the borrower thirty-five additional days to pay the balance before repossession. (§ 1812.402, subd. (e).) Third, the lender must disclose "in writing in at least 10-point type" detailed information pertaining to the borrower's rights under the Act. (§ 1812.402, subd. (f).)

In enacting this statutory scheme, the Legislature intended to protect borrowers from a lender's collection efforts during a reasonable time the borrower's disability claim is being processed: "The Legislature finds and declares that it is unfair for a creditor who has directly participated in, arranged, or received a commission or other compensation for the sale of credit disability insurance to the debtor . . . to invoke a creditor's remedy because of a debtor's nonpayment of any sum which has become due during a period of disability until a reasonable time has passed for the disability insurance claim to be filed, verified and processed." (§ 1812.400.) The Act

"(a) No creditor . . . shall invoke any creditor's remedy against a debtor because of the debtor's nonpayment of any sum which becomes due during any disability claim period and for which credit disability insurance coverage . . . is provided.

"(b) Upon initially receiving notice . . . of the debtor's claim of disability, the creditor shall inform the debtor in writing of the name, address, and telephone number of the insurer . . . from whom the debtor may obtain claim forms. Upon receiving notice of the disability claim, the insurer . . . shall send necessary claim forms to the debtor. The debtor shall submit the claim to the insurer . . . and shall notify the creditor, . . . that a claim has been submitted.

"⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳ ⸳

"(e) If the insurer pays the claim within the disability claim period, the creditor shall treat each payment made by the insurer as though it were timely made by the debtor. If the insurer rejects the claim within the disability claim period or accepts the claim within the claim period as a partial disability which results in a payment of less than the full benefit which would be paid for the total disability, the debtor shall have the opportunity to pay the entire amount which became due during the claim period or the difference between the amount which became due during the claim period and the amount paid by the insurer for the partial disability without being subject to any creditor's remedy, except the imposition of late charges, for 35 days following the date on which the insurer sends notice of the rejection of the claim or acceptance of the claim as a partial disability. In the event the debtor does not pay the entire amount which became due during the claim period plus any accrued late charges within 35 days from that date, the creditor may then invoke any creditor's remedy."

The Act defines "disability claim period" as "the period beginning on the due date of the first payment not paid by the debtor for which the debtor claims disability coverage . . . and continuing until three calendar months thereafter or until the insurer pays or rejects the claim, whichever occurs sooner." (Civ. Code, § 1812.401, subd. (e).) All further statutory references are to the Civil Code unless otherwise specified.

provides "[t]he debtor may bring an action for damages, equitable relief, or other relief for any violation of this title." (§ 1812.402, subd. (i).) The Act's "rights and remedies" are "cumulative . . . to all other rights and remedies which the debtors may have under other laws." (§ 1812.402, subd. (h).)

Credit Union does not dispute that it was a creditor within the meaning of the Act and that the Act "might have provided a basis for a separate cause of action against [Credit Union] . . . ."[8] Credit Union argues, however, that McManis never pled a separate cause of action under section 1812.400 or sought to amend the complaint based on the Act and therefore she cannot now assert the Act as an independent basis for reversing the summary judgment. (See *Bostrom* v. *County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1663 [42 Cal.Rptr.2d 669].)

Credit Union's focus is too narrow. The Act is not relevant here to permit McManis to add a new cause of action on appeal. Rather, the Act is relevant because it shows Credit Union failed to satisfy its burden to negate McManis's breach of contract theory. Credit Union produced evidence showing it repossessed McManis's vehicle on December 15, over three months after McManis's loan first went into default (August 30). But Credit Union did not present any evidence showing it satisfied several of the Act's other provisions.

First, it is undisputed Credit Union moved for relief from the bankruptcy stay on November 5, violating the statutory prohibition on "commenc[ing] . . . any action or special proceeding" within three months of the default. (§§ 1812.401, subd. (d), 1812.402, subd. (a).) Second, Credit Union proffered no evidence it made the required disclosures to McManis. (§ 1812.402, subd. (f).) Third, Credit Union produced no evidence showing it permitted McManis 35 days to satisfy the outstanding debt once Life Investors agreed to partially accept the claim. (§ 1812.402, subd. (e).) Since Credit Union made no showing it complied with directly applicable statutory mandates, Credit Union failed to show the repossession was authorized "by law" and thus that repossession was permissible under the Agreement.

■ Credit Union argues that because McManis failed to cite the Act in opposition to the summary judgment motion, this court is precluded from relying on the statutory scheme. This argument reflects a misunderstanding of Credit Union's burden on a summary judgment motion. "[F]or purposes

---

[8]The Act defines a "creditor" to include a lender that "directly participated in, arranged, or received a commission or other compensation for the sale of credit disability insurance to the debtor . . . ." (§ 1812.401, subd. (b).) The undisputed evidence establishes Credit Union arranged, and received a commission for, the sale of McManis's disability insurance policy.

of section 437c, a moving defendant is statutorily treated as a 'plaintiff,' and hence must present sufficient facts to make out a prima facie case of *non*liability." (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 552 [5 Cal.Rptr.2d 674].)

Credit Union sought to establish McManis could not recover on her breach of contract claim because it had a complete defense under the Agreement—it was entitled to repossess the vehicle because McManis was in default. However, under the Agreement, Credit Union could establish a complete defense only by satisfying two contractual conditions: (1) the existence of a default on December 15, *and* (2) the repossession was authorized by law. Credit Union did not prove the second contractual prerequisite to repossession—that repossession was permitted by applicable law (the Act). Thus, Credit Union was not entitled to summary judgment.

Credit Union alternatively argues McManis waived her right to rely on the Act by failing to raise the issue in her appellate briefs. However, the rule that a Court of Appeal will not consider points not raised in an appellate brief is "largely for the convenience of the reviewing court. [Citation.] A reviewing court is empowered to decide a case on any proper points or theories, whether urged by counsel or not . . . and will exercise that authority under fair procedure in an appropriate case . . . ." (*Tan* v. *California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811 [189 Cal.Rptr. 775]; see also *Banco Do Brasil, S.A.* v. *Latian, Inc.* (1991) 234 Cal.App.3d 973, 999 [285 Cal.Rptr. 870].)

Before oral argument, we gave the parties an opportunity to file supplemental briefs on the applicability of the Act. Each party filed a brief, including Credit Union, which submitted a seven-page letter brief. The parties were further given the opportunity to express their views on the applicability of the Act at oral argument. Because Credit Union had full opportunity to address the applicability of the Act and the Act reflects a clearly stated public policy, it is fair to apply the statute under the circumstances here. Moreover, since Credit Union is in the business of offering disability policies, it is not an unfair assumption that Credit Union was aware or reasonably should have been aware of the Act.

We conclude Credit Union failed to meet its burden on summary judgment to negate McManis's contract claim because it did not establish it complied with the Act before it repossessed McManis's vehicle.[9]

---

[9] We express no opinion as to whether McManis would be entitled to amend her complaint to allege a cause of action under the Act. A ruling on any such motion would be within the sound discretion of the trial court. (Code Civ. Proc., § 473.)

## 2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Judgment reversed as to Credit Union. Judgment affirmed as to Life Investors and Auto Recovery. Each party to bear its own costs.

Work, Acting P. J., and Huffman, J., concurred.

A petition for a rehearing was denied March 3, 1998, and the petition of appellant San Diego Postal Credit Union for review by the Supreme Court was denied May 13, 1998.

---

*See footnote 1, *ante*, page 547.