[No. D034206. Fourth Dist., Div. One. Feb. 8, 2001.]

LAWRENCE BAME, Plaintiff and Appellant, v.
CITY OF DEL MAR, Defendant and Respondent.

[No. D034354. Fourth Dist., Div. One. Feb. 8, 2001.]

CITY OF DEL MAR, Plaintiff and Respondent, v.
22nd DISTRICT AGRICULTURAL ASSOCIATION, Defendant and
Appellant.

1348

**COUNSEL**

Alexandra M. Kowka for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Mary Hackenbracht and Randall B. Christison, Deputy Attorneys General; and Barry J. London for Defendant and Appellant.

McDougal, Love, Eckis, Smith & Boehmer, Tamara A. Smith, Stephen M. Eckis and Tiffany L. Parish for Plaintiff and Respondent and for Defendant and Respondent.

**OPINION**

**O'ROURKE, J.**—The 22nd District Agricultural Association (the District) appeals a judgment in favor of the City of Del Mar (the City) declaring Del Mar Municipal Code section 3.08 et seq. (the ordinance) facially valid and the City entitled under Business and Professions Code section 19610.6[1] to assess and collect license fees and admissions taxes on certain events conducted under contract with the District. The District asks us to declare the ordinance unconstitutional as ultra vires, or alternatively as applied on the grounds it (1) infringes on the District's sovereign immunity; (2) attempts to regulate fields preempted by state law; and (3) burdens the District's First Amendment rights. In a consolidated appeal, Lawrence

---

[1]All statutory references are to the Business and Professions Code unless otherwise indicated.

Bame, an event promotor who rents space from the District, appeals the court's judgment of dismissal entered after it granted the City's demurrer to Bame's complaint for declaratory relief and money damages. Bame contends the court abused its discretion and denied him due process by refusing to allow his intervention in the City's lawsuit for declaratory relief, and erroneously ruled his action was barred by res judicata and collateral estoppel by virtue of the trial court's grant of summary judgment in the City's favor.

We conclude the District's sovereign immunity extends to entities contracting with the District that operate consumer exhibitions and demonstrations encompassed within the District's broad functions and reverse the judgment against the District with directions. We further conclude the court erred in sustaining the City's demurrer to Bame's complaint to the extent Bame sought a refund of fees and taxes paid to the City. Consequently, we reverse the judgments with directions set forth below.

FACTUAL AND PROCEDURAL BACKGROUND[2]

The District is a "state institution" created under the provisions of the Food and Agricultural Code. (Food & Agr. Code, § 3953; *Sixth District etc. Assoc. v. Wright* (1908) 154 Cal. 119, 128 [97 P. 144]; *People v. Gillard* (1997) 57 Cal.App.4th 136, 159 [66 Cal.Rptr.2d 790].) It is formed for the express purposes of "[h]olding fairs, expositions and exhibitions for the purpose of exhibiting all of the industries and industrial enterprises, resources and products of every kind or nature of the state with a view toward improving, exploiting, encouraging, and stimulating them," and "[c]onstructing, maintaining, and operating recreational and cultural facilities of general public interest." (Food & Agr. Code, §§ 3951, subds. (a), (b), 3953.) The District conducts the Del Mar Fair during the months of June and July, leases its property to the Del Mar Thoroughbred Club, which conducts live horse racing on the District's fairgrounds, and operates satellite wagering for horse racing throughout the year. In addition to these events, the District contracts with organizations that conduct events on the Del Mar Fairgrounds unrelated to horse racing and wagering, such as gun, antique and garden shows.

Chapter 3.08 of the Del Mar Municipal Code authorizes the City to levy and collect a 10 percent tax on the price of admission for each admission to

[2]For purposes of determining the propriety of the court's grant of summary judgment, we set forth the facts undisputed by the parties and other facts in the light most favorable to the City. (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1520 [80 Cal.Rptr.2d 94].) We also incorporate undisputed facts contained in declarations submitted in response to the court's request for supplemental briefing on issues relating to the application of section 19610.6.

"any event anywhere in the City," and also more specifically a 40 cent tax on each admission to any horse racing event.[3] Del Mar Municipal Code section 3.08.020, entitled Distribution in Lieu of Tax, reflects the City's election to receive funds from entities conducting horse racing meetings and satellite horse racing meetings and to suspend imposition of admissions taxes and other fees in accordance with the Business and Professions Code. Del Mar Municipal Code section 3.08.020 provides:

"A. For those entities which conduct horse racing meetings and which distribute funds to the City in accordance with the provisions of the Business and Professions Code, the City elects to receive those funds in lieu of the Admissions Tax imposed by this Chapter and will suspend the imposition of other taxes and fees in accordance with the requirements of the Business and Professions Code.

"B. For those entities which conduct satellite horse racing meetings and which distribute funds to the City in accordance with the provisions of the Business and Professions Code, the City elects to receive those funds in lieu of the Admissions Tax imposed by this Chapter and will suspend the imposition of other taxes and fees in accordance with the requirements of the Business and Professions Code. [(Ord. 511).]"[4] It is undisputed that the admissions tax is "paid 100% by contractors who put on events at [the] Del Mar Fairgrounds"; the tax is not collected by the City at any other location.

Since 1985, the City has received a percentage of the parimutuel wagers from live horse racing in lieu of imposing the admissions tax on Del Mar

---

[3]Del Mar Municipal Code section 3.08.010 provides: "A. Unless otherwise provided in this Chapter, when a charge of admission price for a single admission is paid for the right or privilege of being admitted to any event anywhere in the City, there is levied and assessed, and there shall be collected, a tax of 10 percent of the price of admission for each such admission, with a minimum tax due on each such admission of 15 cents. . . . [¶] B. (1) When a charge or admission price for a single admission is paid for the right or privilege of being admitted to any horse racing event, there is levied and assessed, and there shall be collected, a tax of 40 cents for each such admission . . . ." At oral argument, the City's counsel stated the ordinance was adopted in 1988, just prior to the Legislature's enactment of section 19610.6. The parties do not contest that fact.

[4]Del Mar Municipal Code section 3.08.030 contains exemptions and provides: "A. The City Council may at any time, by the affirmative vote of at least three of its members entered upon the City Council minutes, waive any or all of the requirements of this Chapter with respect to any business or event which is conducted or sponsored within the City by any institution, organization, association or corporation which is organized and carried on wholly for the benefit of religious, charitable, educational, recreational or scientific purposes and from which no individual person, other than bona fide employees and help necessarily contracted for, receives or is eligible to receive any gain, remuneration or profit. (Ord. 24, Par. 13) [¶] B. The provisions of this Chapter shall not apply to admissions to a county fair regularly conducted by a district agriculture association organized pursuant to Division 1, Chapter 3, Article 2, of the Agricultural Code of the State, nor to events conducted as part of such county fair. (Ord. 24, Par. 16)"

Thoroughbred Club patrons. In 1988, after the District expanded its activities to include satellite wagering, the City received a percentage of the parimutuel wagers from satellite racing in lieu of imposing an admissions tax on the District. Since that time, the City has consistently received a percentage of the parimutuel satellite wagers. In approximately 1993, the District increased its efforts to contract with private entities that conduct conventions and exhibitions on the Del Mar Fairgrounds. According to the City's director of finance, before January 1996 the City had always imposed the admissions tax on the events conducted by contract with the District and had always required business licenses from private entities doing business within the City's jurisdiction. Those contractors who conducted events unrelated to horse racing or satellite wagering paid the business license fees and admissions taxes.

In January 1996, event operators began to refuse to pay the business license fees and admissions taxes. After certain contractors demanded the City refund fees and taxes paid by them for past events, the City sought a judicial determination that it had the ability under section 19610.6 to assess and collect those fees and taxes on events unrelated to the Del Mar Fair and horse racing and conducted by contract with the District. Bame, who alleged that up until 1997 he paid the City a 10 percent admissions tax for conducting his home and garden show, unsuccessfully sought to intervene in the City's lawsuit.[5]

The City moved for summary judgment or alternatively summary adjudication of issues, arguing neither section 19610.3 nor section 19610.4 applied to the City, and the plain language of section 19610.6 authorized the City to impose fees and taxes on events unrelated to horse racing and wagering

---

[5]According to the City, the superior court clerk inadvertently filed Bame's proposed complaint for declaratory relief and money damages as superior court case No. N080584. The City in any event demurred to the complaint, stating it failed to state a cause of action on the ground the trial court's order denying intervention in the City's action against the District was law of the case and barred Bame's action by res judicata. The court sustained City's demurrer without leave to amend, ruling the controversy was litigated in the City's action against the District. Bame appealed the order sustaining the demurrer, and we consolidated his appeal with the District's. Noting that an order sustaining a demurrer is not separately appealable but is reviewable on appeal from the final judgment (*Shepardson v. McLellan* (1963) 59 Cal.2d 83, 88 [27 Cal.Rptr. 884, 378 P.2d 108]; Code Civ. Proc., § 472c, subd. (b)(1)), we construe Bame's notice of appeal liberally in favor of its sufficiency (Cal. Rules of Court, rule 1(a)) and interpret it to apply to the subsequently entered judgment of dismissal rather than the nonappealable order. (*Hebert v. Los Angeles Raiders, Ltd.* (1991) 23 Cal.App.4th 414, 418, fn. 1 [29 Cal.Rptr.2d 540]; *Federer v. County of Sacramento* (1983) 141 Cal.App.3d 184, 185 [190 Cal.Rptr. 187].)

conducted by contract with the District.[6] After considering further briefing on issues related to the City's claim that it elected to receive distributions under section 19610.6, the court granted the City's motion, ruling as a matter of law that under section 19610.3, "the City is entitled to assess and collect taxes on the events conducted by contract with 22nd District Agricultural Association, which are unrelated to horse racing, satellite wagering and the fair." The court denied the District's motion to the extent it was not moot. Following its ruling, the court received additional arguments as to the ordinance's constitutionality and issued a supplemental order ruling the ordinance was not facially invalid. The court entered judgment in the City's favor.

## DISCUSSION

### I. District's Appeal

#### A. Standard of Review

■ On appeal from a summary judgment, we review the record de novo to determine whether the District is entitled to judgment as a matter of law. (*McManis v. San Diego Postal Credit Union* (1998) 61 Cal.App.4th 547, 555 [71 Cal.Rptr.2d 617].) We strictly construe the District's affidavits, liberally construe the City's affidavits and resolve all doubts regarding the existence of material, triable issues of fact in the City's favor. (*Stationers Corp. v. Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]; *Jacobs v. Universal Development Corp.* (1997) 53 Cal.App.4th 692, 697 [62 Cal.Rptr.2d 446].) To the extent resolution of the issues depends on interpretation and application of a statute to undisputed facts, we decide those issues de novo. (*International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611 [38 Cal.Rptr.2d 150, 888 P.2d 1279].)

The District's contention that it, as a state agency, is protected by sovereign immunity raises a question of law based on undisputed facts and is therefore subject to our independent or de novo review. (*Laidlaw Waste Systems, Inc. v. Bay Cities Services, Inc.* (1996) 43 Cal.App.4th 630, 635 [50 Cal.Rptr.2d 824] (*Laidlaw*).) Similarly, its contention that the City ordinance is preempted by state law raises questions of law subject to de novo review. (*Horton v. City of Oakland* (2000) 82 Cal.App.4th 580, 584 [98 Cal.Rptr.2d 371]; *Bravo Vending v. City of Rancho Mirage* (1993) 16 Cal.App.4th 383, 391-392 [20 Cal.Rptr.2d 164].)

---

[6] Sections 19610.3, 19610.4 and 19610.6 are contained in chapter 4, division 8 of the Business and Professions Code (the Horse Racing Law). As discussed *post*, those sections authorize specified entities that conduct live horse racing or satellite wagering to deduct portions of total parimutuel wagers and distribute them to the city or county in which the racing is conducted after payment of any possessory interest taxes.

B. *Analysis*

 We emphasize that the only matter at issue is whether the City may validly impose its admissions tax on entities that, under contract with the District and on District property, conduct consumer-oriented events unrelated to horse racing and satellite wagering. The City maintains it "does not impose a business license requirement on the District or the Del Mar Thoroughbred Club, the association which conducts horse racing and satellite wagering. Nor does the City impose admissions taxes on patrons of the racetrack or the Del Mar Fair." Given these admissions, in resolving the City's request for declaratory relief we do not address the validity of the ordinance to the extent it arguably permits the City to tax or impose fees upon the District itself or Del Mar Thoroughbred Club patrons, as that would be an advisory opinion only. The controversy that is the subject of declaratory relief " ' "must be of a character which admits of specific and conclusive relief by judgment within the field of judicial determination, as distinguished from an advisory opinion upon a particular or hypothetical state of facts . . . . While ordinances and statutes are inherently proper subjects of declaratory relief, . . . a declaratory judgment may not be rendered in respect to them in disregard of the customary limitations upon the granting of such relief." [Citations.]' [Citation.]" (*Redwood Coast Watersheds Alliance v. State Bd. of Forestry & Fire Protection* (1999) 70 Cal.App.4th 962, 968 [83 Cal.Rptr.2d 24].)

 The District's argument that it is immune from the City's tax combines the distinct concepts of sovereign immunity and preemption. It contends the City cannot apply its admissions tax to events occurring at the District's facilities because the fields of horse racing and District activities are matters of statewide concern, the District's public purpose includes making its facilities available to various groups, and the tax is regulatory, not revenue raising. The City maintains its ordinance is a valid exercise of its constitutional power to tax (Cal. Const., art. XI, § 5, subd. (a)) and further asserts that when the District is acting in a "proprietary" as opposed to its governmental capacity, as here when it contracts with entities to put on private shows and events, it is not entitled to the protection of sovereign immunity. By referring to article XI, section 5, subdivision (a) of the state Constitution, the City raises its "home rule" powers. (*Johnson v. Bradley* (1992) 4 Cal.4th 389, 397 [14 Cal.Rptr.2d 470, 841 P.2d 990].)

In determining whether the District's contractors are exempt from local regulations under the doctrine of sovereign immunity, the relevant inquiry is whether the District acts within its governmental capacity in contracting with these entities. The City's "home rule" authority is not pertinent to this

analysis. (*Hall v. City of Taft* (1956) 47 Cal.2d 177, 183 [302 P.2d 574]; *Laidlaw, supra,* 43 Cal.App.4th at p. 638.) ■ "State agencies . . . enjoy immunity from local regulation unless the state, through statute or provision of the California Constitution, has consented to waive such immunity. [Citation.] . . . 'Because the "state's immunity from local regulations is merely an extension of the concept of sovereign immunity" [citation], the consent to waive the immunity must be stated in "express words" [citation] in a statute [citation].' [Citation.]" (*Laidlaw, supra,* 43 Cal.App.4th at p. 635.) The issue of sovereign immunity is distinct from that of preemption. As this court explained in *Laidlaw,* "state agencies are indeed immune from . . . local regulation absent an express legislative or constitutional waiver of that immunity. Since the question is one of immunity, not preemption, it makes no difference whether the local governmental entity is a charter city as opposed to some other form of local government. The sovereign immunity of a state agency from local regulation does not depend upon the source of the local governmental entity's authority to make regulations, it depends upon whether consent to regulation has been expressly stated by the Legislature or in the state Constitution." (*Id.* at pp. 638-639.)

The parties acknowledge that the District's immunity is limited to situations where the District is operating in its governmental capacity. (*Board of Trustees v. City of Los Angeles* (1975) 49 Cal.App.3d 45, 49 [122 Cal.Rptr. 361] (*Board of Trustees*).) While the distinction between governmental and proprietary activity is no longer applicable to determine governmental tort liability, it remains viable in the context of encroachment of municipal regulations. (*Ibid.*; see also 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 796, pp. 325-326 ["Although the governmental-proprietary activity distinction has been abrogated in tort liability cases . . . it should be applied in the field of local regulation, so as to limit the immunity of the state to situations in which the state is acting in a governmental capacity"].)

■ Pointing to its statutory purpose of "[h]olding fairs, expositions and exhibitions" as well as "[c]onstructing, maintaining, and operating recreational and cultural facilities of general public interest" (Food & Agr. Code, § 3951), the District argues its actions in making its facilities available to private entities is "part of its intended public purpose, not merely ancillary revenue raising." The District also points out it is empowered to lease its property for public park, recreation or playground purposes. (Food & Agr. Code, § 4051.) The City, relying primarily on *Board of Trustees, supra,* 49 Cal.App.3d 45, contends the District cannot extend its immunity to private persons who contract with it to put on private shows because those activities are proprietary. It essentially characterizes the consumer events as entertainment.

Based on the record before us, we reject the argument that the District's leasing of its property to private entities for consumer events is solely a revenue-producing or proprietary activity not within its governmental functions. The scope of the relevant inquiry is defined by the particular activities in question—contracting with entities that put on events such as home and garden, gun and antique shows at the District's facilities. (See *Guidi v. California* (1953) 41 Cal.2d 623, 625-627 [262 P.2d 3] ["Governmental immunity . . . turns on the nature of the particular activity that leads to the plaintiff's injury, not on the identity of the governmental subdivision or agency carrying on the activity, or on the fact that the facility in question may also be used for governmental purposes"].)[7] In *Board of Trustees*, the court held the Board of Trustees of the California State University and Colleges acted in a proprietary capacity when it leased its property for "shows, fairs, exhibitions, swapmeets and circuses." (*Board of Trustees, supra,* 49 Cal.App.3d at pp. 47, 50.) It explained: "The activities which are conducted [on the state's property] by private operators have no relation to the governmental function of the university. '[T]he state is acting in a proprietary capacity when it enters into activities to amuse and entertain the public. The activities of [the board] do not differ from those of private enterprise in the entertainment industry.' [Citation.] . . . Even less defensible is the university's attempt here to extend its immunity to private entrepreneurs who are involved in the local commercial market where their competitors are subject to local regulation." (*Id.* at p. 50.) In *Guidi v. California*, the court held that the State Agricultural Society, alleged to organize and operate solely to interest and educate the general public in agricultural and industrial subjects, was not immune to the extent it conducted a fireworks show and operated a horse arena. (*Guidi v. California, supra,* 41 Cal.2d at pp. 625, 627-628.)

In *Board of Trustees*, events such as swap meets and circuses plainly had "no relation to" the governmental function of the university. (*Board of Trustees, supra,* 49 Cal.App.3d at p. 50.) Here, the District's purposes as they relate to the promotion of California's industries, products and resources, are very broad. They are geared toward featuring "all of the industries and industrial enterprises, resources and products *of every kind or nature of the state*" in order to improve, exploit, encourage and stimulate those industries and industrial enterprises. (Food & Agr. Code, § 3951, subd. (a), italics added.) The purposes are not limited to agricultural or industrial

---

[7]As noted by the Ninth Circuit Court of Appeals in *Great Western Shows, Inc. v. Los Angeles County* (9th Cir. 2000) 229 F.3d 1258, *Guidi v. California* is effectively overruled in the tort context, but because the governmental-proprietary distinction is still valid in the municipal law context, its analysis applies here. (*Great Western Shows, Inc. v. Los Angeles County, supra,* 229 F.3d at p. 1265.)

subjects. The events at issue are product exhibitions—guns, antiques, and home-and-garden-related products. These events fall within the broad definition of the District's purposes to educate or inform consumers of California's products, industries or resources. Moreover, the District is formed to maintain and "operat[e]" recreational and cultural facilities of "general public interest." While the applicable statutory provision dealing with the District's purposes does not expressly include leasing its land to or contracting with private entities so that those entities may exhibit or operate recreational facilities, such activities are encompassed within the District's purpose of "operating" recreational and cultural events of general public interest. Indeed, in furtherance of the District's functions, the Legislature has given the District power to enter into revenue generating contracts (Food & Agr. Code, § 3965.1) and put its property to any use authorized by its board. (Food & Agr. Code, § 4051, subd. (c).) Given the broad functions and authority granted to the District, we hold its sovereign immunity extends to those private entities with which it leases or contracts in order to put on consumer product exhibitions and shows. Our conclusion is consistent with a 1958 opinion of the Attorney General in which it concluded the operations of the District 1-A Agricultural Association, as well as its lessees and licensees, were immune from a San Mateo County business licensing ordinance. (See 31 Ops.Cal.Atty.Gen. 46, 51, 52 (1958) [operation of public auditoriums and public fair grounds of District 1-A Agricultural Association, even when used by private persons, subserves a public purpose; San Mateo County business licensing ordinance had no application to operations of the association, nor to the operations of lessees, licensees, concessionaries, etc. of the association].) ■ " 'Opinions of the Attorney General, while not binding, are entitled to great weight. [Citations.] In the absence of controlling authority, these opinions are persuasive "since the Legislature is presumed to be cognizant of [the Attorney General's] construction of the statute." ' " (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2], citing *Napa Valley Educators' Assn. v. Napa Valley Unified School Dist.* (1987) 194 Cal.App.3d 243, 251 [239 Cal.Rptr. 395]; see also *Rodeo Sanitary Dist. v. Board of Supervisors* (1999) 71 Cal.App.4th 1443, 1447 [84 Cal.Rptr.2d 601].) Here, the Legislature is presumed to have knowledge of the Attorney General's conclusions as to the unique nature and immunity of district agriculture associations.

■ It is settled that the Legislature can expressly consent to regulation and to that extent waive sovereign immunity. But in order to be effective, such a waiver must be express, and not inferred by implication. *Del Norte Disposal, Inc. v. Department of Corrections* (1994) 26 Cal.App.4th 1009, 1013 [31 Cal.Rptr.2d 746] listed examples of "effective express waiver" as: "(1) a statute which provides that certain state agencies 'shall comply' with

the building and zoning ordinances of cities and counties in which they are situated [citations]; (2) a statutory scheme which authorizes local public entities to enact rules subjecting the state to claim filing requirements [citations]; and (3) a statute which provides that every 'person' must obtain a permit for coastal development from the city and 'person' is defined to include the state government [citations]." ▮ The City contends that by enacting sections 19610.3, 19610.4 and 19610.6, the Legislature expressly acknowledged and relinquished any immunity the District or its contractors may have from the City's admissions tax. We attempt to ascertain the Legislature's intent under settled rules of statutory construction, beginning by examining the plain language. (*People v. Thomas* (1992) 4 Cal.4th 206, 210 [14 Cal.Rptr.2d 174, 841 P.2d 159].)

In the Horse Racing Law, an "association" is defined as any person engaged in the conduct of a recognized horse race meeting. (§ 19403.) A "person" includes any "individual, partnership, corporation, limited liability company, or other association or organization." (§ 19413.) The District is identified as a "state designated fair," and is also referred to as a "fair" in that chapter. (§§ 19418, subd. (a), 19418.1, subd. (22).) The undisputed facts establish that the Del Mar Thoroughbred Club is the "association" (as defined in § 19403) that conducts horse race meetings on District property as the District's lessee. As indicated, the District itself conducts satellite wagering on the fairgrounds.

Section 19610.3[8] as applied here addresses deduction of parimutuel wagers by the Del Mar Thoroughbred Club. The section permits the Del Mar

---

[8]Section 19610.3, originally enacted in 1982, provides: "In addition to the amounts required or allowed to be deducted from the parimutuel pools as provided by this chapter, and except as otherwise provided in this section, every association that conducts a racing meeting may elect permanently to deduct an additional amount up to 0.33 of 1 percent from the total parimutuel wagers placed within its inclosure. This election is not available to the California Exposition and State Fair or to a county or district agricultural association fair unless, prior to January 1, 1984, the city or county in which the fair meeting was being conducted levied a license fee or excise tax pursuant to Section 19495 or imposed an admission tax on track patrons. [¶] The amounts deducted pursuant to this section shall be retained by the association or fair for the payment of possessory interest taxes, if any, assessed against the organization described in Section 19608.2, the racing association, or fair, and after payment of these taxes shall be distributed to the city in which the racing meeting is conducted or, if the meeting is conducted outside the limits of any city, to the county in which the racing meeting is conducted. If a city or county has elected by ordinance to receive a distribution from a racing association under this section, it shall not at any time thereafter assess or collect, with respect to an event conducted by that racing association, or an event conducted by or by contract with that association or fair, any license or excise tax or fee, including, but not limited to, any admission, parking, or business tax, or any tax or fee levied solely upon the racing association conducting a racing meeting or any racing patron, participant, service-supplier, promoter, or vendor thereof. Further, a city or county electing to receive a distribution under this section shall continue to provide ordinary and traditional municipal services, such as police services

Thoroughbred Club (the "association that conducts a racing meeting") to "elect permanently" to deduct a specified percentage of the total parimutuel wagers and distribute a portion to the City if the City has elected by ordinance to receive the distribution. (*Ibid.*) If the City makes this election, the section mandates that the City "shall not at any time thereafter assess or collect, with respect to an event conducted by that racing association, *or an event conducted by or by contract with that association or fair,* any license or excise tax or fee, including, but not limited to, any admission, parking, or business tax, or any tax or fee levied solely upon the racing association conducting a racing meeting or any racing patron, *participant, service-supplier, promoter, or vendor thereof.*" (*Ibid.,* italics added.) The italicized phrases were added by the Legislature in 1995. (Stats. 1995, ch. 959, § 3.) In 1986, the Legislature enacted section 19610.4,[9] giving the city a similar option to elect to receive distributions from the District's satellite wagering facility.

The Legislature enacted section 19610.6 effective in 1989. (Stats. 1988, ch. 1277, § 1, p. 4268.) That section applies solely to the District. By its plain language, section 19610.6 mandates that the District deduct certain amounts of parimutuel wagers from satellite wagering in lieu of making deductions under sections 19610.3 and 19610.4. The section reads: "Notwithstanding Section 19605.71, and in lieu of any deduction under Section

---

and traffic control, in connection with racing meetings. 'Ordinary and traditional services,' as used in this section, means those services provided by the city or county at no charge to the racing association in 1981. If an eligible city or county does not elect to receive a distribution under this section, the amount remaining after payment of possessory interest taxes, if any, as provided in this section shall be paid to the state as an additional license fee."

[9]Section 19610.4 provides: "Notwithstanding Section 19610.3, any association that conducts a racing meeting pursuant to Section 19549.3 or 19549.9, or any fair that operates a satellite wagering facility, may elect to deduct an additional amount of 0.33 of 1 percent from the total parimutuel wagers placed within its inclosure or at its satellite wagering facility. [¶] The amounts deducted pursuant to this section shall be retained by the association or fair for the payment of possessory interest taxes, if any, assessed against the organization described in Section 19608.2, the racing association, or fair, and after payment of these taxes shall be distributed to the city or county in which the racing meeting or wagering is conducted, at the option of the association or fair. If a city or county has elected by ordinance to receive a distribution from a racing association or fair under this section, it shall not at any time thereafter assess or collect, with respect to an event conducted by that racing association or, *an event conducted by or by contract with that* fair, any license or excise tax or fee, including, but not limited to, any admission, parking, or business tax, or any tax or fee levied solely upon the racing association or fair conducting a racing meeting or satellite wagering, or any patron, *participant, service-supplier, promoter, or vendor* thereof. Further, a city or county electing to receive a distribution under section shall provide ordinary and traditional municipal services, such as police services and traffic control, in connection with the racing meetings or satellite wagering. If an eligible city or county does not elect to receive a distribution under this section, the amount remaining after payment of possessory interest taxes, if any, as provided in this section shall be paid to the state as an additional license fee." (Italics added.) The section was amended in 1995 to add the italicized phrases, among other changes. (Stats. 1995, ch. 959, § 4.)

19610.3 or 19610.4, the 22nd District Agricultural Association shall deduct an additional amount of 0.33 of 1 percent from the total parimutuel wagers placed at its satellite wagering facility. [¶] Forty percent of the amount deducted pursuant to this section shall be distributed to the City of Del Mar and 40 percent shall be distributed to the City of Solana Beach, if the respective city has elected to receive a distribution under this section. The remaining amounts deducted pursuant to this section shall be distributed to the San Dieguito River Valley Regional Open Space Park Joint Powers Authority . . . . If the City of Del Mar or the City of Solana Beach has elected by ordinance to receive a distribution from a fair under this section, it shall not at any time thereafter assess or collect, with respect to an event conducted by that fair, any license or excise tax or fee, including, but not limited to, any admission, parking, or business tax, or any tax or fee levied solely upon the fair conducting satellite wagering or any patron thereof. Furthermore, a city electing to receive a distribution under this section shall provide ordinary and traditional municipal services, such as police services and traffic control, in connection with the satellite wagering. If an eligible city does not elect to receive a distribution under this section, the amount deducted shall be paid to the state as an additional license fee." (§ 19610.6.)

Although it can be fairly argued that the above referenced statutes suggest a municipality may tax the District (e.g., § 19610.6: "If the City of Del Mar . . . has elected by ordinance to receive a distribution . . . it shall not at any time thereafter assess or collect . . . any license or excise tax or fee . . . ."), nothing in them expressly authorizes the City to impose license fees or taxes on the District or entities contracting with it, nor do they expressly state that the District, its lessees or persons contracting with the District shall be subject to City license taxes or fees. These provisions do not constitute express consent by the state to taxing or regulation of the District or its contractors by the City, should the City decline distributions from horse race meetings conducted by the Del Mar Thoroughbred Club or satellite wagering conducted by the District.[10] Consequently, as applied to permit the City to impose an admissions tax on the entities contracting with the District to put on consumer shows, section 3.08.010 of the ordinance

[10]We note an ambiguity in section 19610.3 as it is drafted that becomes irrelevant in view of our holding. Section 19610.3 authorizes an association that conducts a racing meeting to permanently deduct the specified percentage of wagers if it chooses, and the City to elect to take such distribution, but in the event the City makes such an election, the section prohibits it from taxing "event[s] conducted by that racing association, or an event conducted by or by contract with that association *or fair* . . . ." (Italics added.) The italicized words "or fair" inject ambiguity because under the statute it is not the fair that elects to make the deduction. As we read section 19610.3, the italicized words "or fair" are reasonably interpreted to refer to a fair that conducts a racing meeting. Because the Del Mar Thoroughbred Club, not the District, conducts racing meetings, if the City declined a distribution under this section, it could arguably tax events conducted by the Del Mar Thoroughbred Club (the "association")

taxes the District's sovereign activities and is invalid and unenforceable. Similarly, to the extent the City seeks to impose a license fee on entities contracting with the District to put on consumer shows on the fairgrounds, its actions and such fees constitute an improper invasion on the District's sovereignty and the District or its contractors are not subject to the license fees.

Section 3.08.020 of the ordinance is valid insofar as it constitutes the City's election to take deductions from horse race meetings and satellite wagering as permitted by the Business and Professions Code. The effect of the ordinance is as follows: The City has elected to receive one-third of 1 percent of total parimutuel wagers from racing meetings from the Del Mar Thoroughbred Club (the "association that conducts a racing meeting") under section 19610.3, following the Del Mar Thoroughbred Club's permanent election to make that deduction. As the quid pro quo for taking this distribution, the City must provide the association with "ordinary and traditional" municipal services that were provided by the City at no charge in 1981. (§ 19610.3.) The City has also elected to take 40 percent of one-third of 1 percent of parimutuel wagers from satellite wagering from the District under section 19610.6. We reject the District's assertion the City could not have made such election under section 19610.6 because that section was not enacted until after the ordinance was adopted. Following enactment of section 19610.6, the ordinance necessarily operates as the City's election to take a satellite wagering distribution under section 19610.6. The District has no choice but to make its additional satellite wagering deduction under that section, in lieu of making it under section 19610.4. The City's obligation, in exchange for taking the satellite wagering distribution, is to provide "ordinary and traditional municipal services, such as police services and traffic control, in connection with the satellite wagering." (§ 19610.6.)

Having concluded the taxing provision of the ordinance is invalid to the extent it is applied to the District's sovereign activities in contracting with entities to put on consumer-oriented events such as home and garden, gun or antique shows, we need not address the District's preemption arguments or its argument that the ordinance is unconstitutional as applied to the District or events held on its property.

## II. *Bame's Appeal*

■ Bame contends the court erred in denying his motion to intervene in the City's action (case No. N079707) and further argues he was denied due

---

or events conducted by contract with the Del Mar Thoroughbred Club, but only to the extent those events do not fall within the sovereign functions of the District.

process when the court sustained the City's demurrer to his separate complaint on grounds of res judicata and collateral estoppel (case No. N080584). The City responds by pointing out Bame failed to appeal the court's order denying his motion to intervene, and asserts he consequently cannot challenge that ruling. We agree. An order denying intervention is directly appealable because it finally and adversely determines the right of the moving party to proceed in the action. (*Dollenmayer v. Pryor* (1906) 150 Cal. 1, 3 [87 P. 616]; *Bowles v. Superior Court* (1955) 44 Cal.2d 574, 582 [283 P.2d 704]; *In re Veterans' Industries, Inc.* (1970) 8 Cal.App.3d 902, 916 [88 Cal.Rptr. 303]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 70, p. 126.) Bame was entitled to and should have filed a direct appeal from the court's order denying intervention, and he is prevented from challenging the propriety of that order, having failed to do so.

■ Bame is not prevented, however, from appealing the judgment of dismissal entered after the court sustained the City's demurrer to his separate complaint. ■ On appeal from a judgment of dismissal after a demurrer is sustained without leave to amend, we review the order de novo, exercising our independent judgment on whether, as a matter of law, the complaint states a cause of action. (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501 [82 Cal.Rptr.2d 368].)

■ By the first cause of action in his verified complaint, Bame sought a judicial declaration that the City had no legal right to assess and collect business license and admissions taxes on the events conducted by him under contract with the District and on District property. In a second cause of action, Bame sought a refund of all business license and admissions taxes paid by him. The City demurred to Bame's complaint on the grounds that it was barred by the doctrines of law of the case, res judicata, and collateral estoppel as a result of the court's order denying Bame intervention in the City's action against the District. Before the hearing on the City's demurrer in Bame's action, the court in the City's action granted summary judgment in the City's favor. The court in Bame's action sustained the City's demurrer without leave to amend, ruling the controversy in the City's action was fully litigated and concluding Bame's claims were actually litigated in the City's action.

In considering the City's demurrer on res judicata grounds, we may take judicial notice of the prior order and other court records. (*Kirkpatrick v. City of Oceanside* (1991) 232 Cal.App.3d 267, 281 [283 Cal.Rptr. 191].) ■ "[R]es judicata, of which collateral estoppel is a part, will only ' "preclude[] parties or their privies from relitigating a cause of action that has been finally determined by a court of competent jurisdiction. . . . [Only

an] issue necessarily decided in such litigation is conclusively determined as to the parties or their privies if it is involved in a subsequent lawsuit on a different cause of action." [Citations.]' [Citation.]" (*Ibid.*) Stated in terms of collateral estoppel, " ' "[a] prior determination by a tribunal will be given collateral estoppel effect when (1) the issue is identical to that decided in a former proceeding; (2) the issue was actually litigated and (3) necessarily decided; (4) the doctrine is asserted against a party to the former action or one who was in privity with such a party; and (5) the former decision is final and was made on the merits." [Citation.]' [Citations.] 'The party asserting collateral estoppel bears the burden of establishing these requirements.' [Citations.] Even if these threshold requirements are established, res judicata will not be applied 'if injustice would result or if the public interest requires that relitigation not be foreclosed.' [Citation.]" (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 181 [98 Cal.Rptr.2d 44], italics omitted.)

■ We conclude the trial court, in denying Bame's motion to intervene in the City's action and in granting the City's motion for summary judgment, did not necessarily decide the issue of Bame's entitlement to reimbursement raised in his complaint against the City. Presented with a motion for intervention, the court must determine whether the intervener has established (1) it has a direct interest in the lawsuit; (2) intervention would not enlarge the issues raised by the original parties; and (3) the intervener would not " 'tread on the rights of the original parties to conduct their own lawsuit.' " (*Lincoln National Life Ins. Co. v. State Bd. of Equalization* (1994) 30 Cal.App.4th 1411, 1422 [36 Cal.Rptr.2d 397]; Code Civ. Proc., § 387.) In denying intervention, the court merely concluded that Bame's rights were adequately represented by the District. But the court further rejected Bame's request to intervene on the ground his intervention would "enlarge" the issues in the case. Although not explained in its order, the court necessarily recognized that Bame sought additional and different relief than the District, namely a refund of business license fees and admissions taxes paid at the City's request under the ordinance, and reasonably concluded that permitting intervention by individual taxpayers seeking refunds would enlarge the issues in the case by virtue of their need to prove individual entitlements to refund, including specific amounts paid as license fees and taxes under the ordinance.

To the extent Bame challenged the validity or constitutionality of the ordinance as applied to entities contracting with the district, we agree those issues were actually litigated and determined in the City's action. But Bame's entitlement to a refund was not encompassed within the court's ruling; indeed it could not have been given the court's finding that the City's fees and taxes were validly imposed under section 19610.6 and a facially

valid ordinance. The City acknowledges that the court's ruling in the City's favor rendered Bame's request for refund moot. We observe the contrary point—if the fees and taxes are held invalid, Bame's separate cause of action for a refund is not moot. While Bame's claim for a refund is dependent upon a declaration of invalidity of the imposition of license fees or taxes, having now concluded those fees and taxes were invalidly imposed on entities contracting with the District to put on shows such as Bame's home and garden show, Bame is entitled to litigate his claim. Without addressing the merits of that claim, we reverse the judgment with directions that the superior court enter a new order overruling the City's demurrer as to Bame's second cause of action and remand the matter for further proceedings.

## DISPOSITION

The judgment in superior court case No. N079707 is reversed and the case remanded with directions to enter a new judgment declaring section 3.08.010 of the ordinance invalid as applied to entities that contract with the District to operate consumer exhibitions and demonstrations encompassed within the District's functions. The judgment of dismissal in superior court case No. N080584 is reversed and the superior court directed to vacate the judgment and order sustaining the City's demurrer without leave to amend and enter a new order overruling the City's demurrer as to Bame's second cause of action. The District and Bame shall recover their costs on appeal.

Nares, Acting P. J., and McIntyre, J., concurred.