BANKE, J.,
Dissenting.—With the majority’s opinion, the law on whether a municipality can ask a state entity to collect a general local tax imposed not on the state entity, but on third parties doing business with the entity, is as follows: Irrigation districts providing electrical service (a proprietary activity because nonstate entities also produce electricity) can be required to collect a local utility users tax. (City of Modesto v. Modesto Irrigation Dist. (1973) 34 Cal.App.3d 504 [110 Cal.Rptr. 111] (City of Modesto)) Water districts providing water and sewer services (both governmental functions (Wat. Code, §§ 71610, 71670)) can be required to collect a local utility users tax. (Eastern Mun. Water Dist. v. City of Moreno Valley (1994) 31 Cal.App.4th 24, 26 [36 Cal.Rptr.2d 823] (Eastern Mun. Water).) The state parks department can be required to collect a local occupancy tax imposed on those using its Asilomar conference center (with no determination of whether this historic and required use of the state’s property is a proprietary activity or governmental function). (65 Ops.Cal.Atty.Gen. 267 (1982).) In addition, a city can impose a local privilege tax on all employees working within its municipal boundaries, including state employees (at least some of whom are presumably performing governmental functions), pursuant to an ordinance that requires employers, including the state, to collect the tax. (Weekes v. City of Oakland (1978) 21 Cal.3d 386 [146 Cal.Rptr. 558, 579 P.2d 449] (Weekes).) However, the majority concludes that the state universities cannot be asked to collect a local parking tax imposed on third parties paying to use the schools’ parking facilities.[1]
Certainly the prior cases differ in varying respects from the case at hand, as the majority points out. But these differences do not, independently or collectively, provide a cogent legal framework that explains how the results in the prior authority—allowing a municipality to look to a state entity for *1124 help in collecting a general local tax imposed on third parties—can exist in harmony with the result here, disallowing such help unless the state entity consents to provide it. I do not see how, for example, water districts can continue to be required to collect local utility taxes on users of water and sewer services in the wake of the majority’s opinion, unless these districts agree to do so.
The majority grounds its conclusion that the state universities need not collect the City and County of San Francisco’s (San Francisco) parking tax on Hall v. City of Taft (1956) 47 Cal.2d 177 [302 P.2d 574] (Hall) and its progeny, the rationale being that requiring the universities to collect the tax would be an impermissible regulation of the universities’ use and maintenance of their property (a governmental function). I certainly agree San Francisco cannot tell the universities, for example, how much of their property they can use for parking, or how much they can charge, or how they can spend their parking revenue. However, in my view, whether the universities can be asked to collect a general local tax imposed on third parties doing business with the schools presents a different question, particularly where the universities will not bear the cost of collection and, thus, there will be no impingement of their sovereign resources.[2] I also think the answer to this question is better informed by those cases addressing the scope of a municipality’s power to tax third parties, than it is by the cases addressing the state’s exemption from local regulation of its governmental functions.
There is no question, however, that the law on whether a municipality can look to a state entity to collect a general local tax imposed on third parties has been far from a paragon of clarity. Respectfully, the majority’s opinion leaves the law in some disarray. Yet municipalities need to know with some assurance whether third parties who do business with a state entity will essentially receive a pass on a general local tax. It is time for our Supreme Court to squarely address this issue and to state clearly whether or not a state entity can be asked to collect a local tax imposed on third parties doing business with the entity, particularly where, as here, the entity will be reimbursed its costs of doing so.
*1125 The Exempt from Local Regulation Cases[3]
In Half the case undergirding the majority’s decision, a general law city ordered work stopped on a public school project, insisting the school district’s contractor comply with its local building ordinance, which included permit and fee requirements. (Hall, supra, 47 Cal.2d at p. 179.) The school district had already secured review and approval of its construction plans through the State Department of Education and Division of the State Architect. {Ibid.) The contractor sued the city, seeking an injunction. The city claimed, in turn, it had the power to enact and enforce local building regulations under its police powers. {Ibid.)
Our Supreme Court held the “public schools of this state are a matter of statewide rather than local or municipal concern” and therefore state “legislative enactments thereon control over attempted regulation by local government units.” (Hall, supra, 47 Cal.2d at pp. 179, 181.) “When [the state] engages in such sovereign activities as the construction and maintenance of its buildings, as differentiated from enacting laws for the conduct of the public at large, it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation.” {Id. at p. 183.)
The high court in Hall quoted extensively from its earlier decision in In re Means (1939) 14 Cal.2d 254 [93 P.2d 105] (Means), in which a state worker employed as a plumber at the state fairgrounds had been arrested for violating a charter city ordinance requiring all journeyman plumbers to obtain a registration certificate. Thus, the issue was “whether a state employee, working entirely on state property, may be punished for his failure to comply with the municipal requirement.” {Id. at p. 255.) The state employee claimed the state had “occupie[d] the field” of state employment and the local ordinance could not be applied “in derogation of sovereignty.” {Id. at p. 257.) The charter city maintained it was empowered to regulate local construction. {Id. at p. 256.)
The Supreme Court agreed with the state employee. “There can be no question concerning the power of the state ... to lay down the qualifications *1126 for its employees. It acts in an exclusive field [citations], and is not subject to the legislative enactments of subordinate governmental agencies.” (Means, supra, 14 Cal.2d at p. 258.) A “municipal affair” is not, explained the court, “entirely a geographical one” (i.e., the bounds of a city), and “an act relating to property within a city may be of such general concern that local regulation concerning municipal affairs is inapplicable.” (Id. at p. 259.) The court quoted from a Kentucky case in which a city had tried to regulate fire escapes on buildings at a state institution for the blind. {Ibid.) “ ‘The municipal government is but an agent of the state, not an independent body. . . . How can [a] city ever have a superior authority to the state over the latter’s own property, or in its control and management? From the nature of things it cannot....’” {Ibid.) The Means court thusly summarized the outcome in the case before it: “The result is a direct conflict of authority. Either the local regulation is ineffective or the state must bow to the requirement of its governmental subsidiary. Upon fundamental principles, that conflict must be resolved in favor of the state.” (Id. at p. 260.)
Halt's language, including its quotations from Means, is an amalgam of what is now considered preemption (e.g., “a matter of statewide rather than local or municipal concern”) and sovereign immunity (e.g., “not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation”) terminology. (Hall, supra, 47 Cal.2d 177 at pp. 181, 183.) In my view, both Hall and Means are best characterized as early cases addressing the scope of “municipal affairs,” over which local municipalities (whether a general law or a charter city) have extensive control, and distinguishing such affairs from matters of “statewide concern,” as to which the state has paramount control.
HalVs progeny have, thus, focused on the distinction between municipal affairs and matters of statewide concern. In City of Santa Ana v. Board of Education (1967) 255 Cal.App.2d 178 [62 Cal.Rptr. 863], for example, the appellate court, relying on Half held the city (not identified as either a charter or general law city) could not require the local school district to employ the city’s garbage collector. {Id. at pp. 179-180.) The court rejected the city’s proffered distinctions between local regulations that directly or indirectly affect internal or external control. The test under Hall as to whether “local regulations may control state maintenance of state buildings,” said the court, is “whether the Constitution or Legislature has consented to such regulation . . . .” (Id. at p. 180.)
In City of Orange v. Valenti (1974) 37 Cal.App.3d 240 [112 Cal.Rptr. 379] (City of Orange), a city (not identified as either a charter or general law city) sued both the state and the owner of a building the state leased to enforce several local ordinances, including a parking ordinance controlling the number of off-street spaces. Citing Hall, the Court of Appeal ruled “[w]hen the *1127 state engages in such sovereign activities as the construction and maintenance of its buildings (and leasing of the building is no different), it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulations.” {Id. at p. 244.) “If the ordinance were applicable, and if more spaces are required than are provided, the use of the building as an unemployment insurance office would have to be curtailed. This would have the effect of limiting the state’s sovereignty by local regulation, which is prohibited by Hall . . . .” {Ibid.) The court went on to conclude the state had not expressly consented to the applicability of the local regulations. {Id. at p. 245.) As for the requirement that the state’s consent must be explicit, the court explained: “A stronger reason for holding that the Legislature’s consent must be expressed in a statute can be drawn from the analogy to the state’s sovereign immunity from damage claims. This immunity stems from the sovereignty of the state, as does the exemption from local regulations.” {Ibid.)
Thus, City of Orange is among the earlier cases describing the state’s paramount authority in matters of statewide concern as an aspect of its sovereign immunity, and in subsequent cases addressing the extent to which the state is exempt from local regulation, the appellate courts have routinely used sovereign immunity terminology.[4]
In Board of Trustees v. City of Los Angeles (1975) 49 Cal.App.3d 45 [122 Cal.Rptr. 361] (Board of Trustees), for example, both the state university and a circus performing on the university’s property were cited for violating a charter city’s ordinance on circuses, which required, among other things, that circuses obtain a permit and pay a fee. {Id. at p. 47.) The university sued for declaratory relief, claiming “activities conducted upon the university’s property were not subject to” local regulation. {Id. at p. 48.) The appellate court held the circus was subject to the ordinance, breaking its analysis into two parts, sovereign immunity and preemption.
The court rejected the university’s sovereign immunity claim on the ground that in leasing its property to the circus, the university was engaged in “proprietary activity” and was not “operating in a governmental capacity.” (Board of Trustees, supra, 49 Cal.App.3d at p. 49.) “The state of the law in the field of tort liability notwithstanding, ... the doctrine of sovereign immunity remains viable. However, we believe that the previously well *1128 recognized distinction between governmental and proprietary activity [citations] serves to limit that immunity to the situation where the state is operating in a governmental capacity.” {Ibid.) The court viewed Hall, Means, and City of Orange as examples ‘“in which the state was clearly acting in its governmental capacity” (although later in its opinion, the court characterized Hall as being based “primarily” on preemption). {Id. at pp. 50-51.) The court further observed the university’s state sovereign immunity ought not to extend to “private entrepreneurs who are involved in the local commercial market where their competitors are subject to local regulation.” {Id. at p. 50) Indeed, in the lease, the university had “specifically disavowed any governmental status for its lessee.” {Ibid.) The court then turned to preemption and, distinguishing Hall, concluded there was no statutory scheme pertinent to the university that purported to vest control of circus performances exclusively in the state. {Id. at pp. 50-52.)
Board of Trustees is, thus, one of the earlier cases drawing a clear distinction between sovereign immunity and preemption analyses, and ruling explicitly that sovereign immunity applies only when the state is acting in its “governmental capacity” and does not apply to the state’s “proprietary activities.”
In Regents of University of California v. City of Santa Monica (1978) 77 Cal.App.3d 130 [143 Cal.Rptr. 276], the University of California, which leased and wanted to improve property for “educational purposes,” sued a charter city after the city claimed the university had to obtain a local building permit and pay permit fees. Accordingly, this case was very similar to Hall, except that it involved a charter city and the Regents of the University of California (Regents). The court first ruled the Regents has every bit as much autonomy over its own affairs as does the state with respect to local school districts—the Regents is “ ‘a branch of the state itself’ ” having “virtual autonomy in self-governance.” (Id. at p. 135, quoting Pennington v. Bonelli (1936) 15 Cal.App.2d 316, 321 [59 P.2d 448].) And, “[i]n view of the virtually plenary power of the Regents in the regulation of affairs relating to the university and the use of property owned or leased by it for educational purposes,” the court held it is “not subject to municipal regulation,” citing to Hall. {Santa Monica, at p. 136.) The court next rejected the city’s invocation of its charter status. “[T]he authority of a charter city to regulate municipal affairs is not plenary [citation]. The California Constitution ([Cal. Const.,] art. XI, § 7) does not authorize municipalities to apply local zoning restrictions to state agencies [citation], a power which may be granted only by legislative consent.” {Santa Monica, at p. 136.)
In Del Norte Disposed, Inc. v. Department of Corrections (1994) 26 Cal.App.4th 1009 [31 Cal.Rptr.2d 746], the company having the exclusive *1129 garbage contract with the local waste authority sued the state and its garbage collector for Pelican Bay State Prison. Quoting Hall, the court reiterated that when the state “ ‘engages in such sovereign activities as the construction and maintenance of its buildings, ... it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation.’ ” (Id. at p. 1012.) And citing to Board of Trustees, the court reiterated that because the state’s “ ‘immunity from local regulations is merely an extension of the concept of sovereign immunity’ [citation], the consent to waive the immunity must be stated in ‘express words.’ ” (Id. at p. 1013.) The court held no such express waiver appeared in the state Integrated Waste Management Act of 1989 (Pub. Resources Code, §§ 40000, 40050 et seq.). (Del Norte Disposal, at pp. 1013-1015.)
This brings me to Laidlaw Waste Systems, Inc. v. Bay Cities Services, Inc. (1996) 43 Cal.App.4th 630 [50 Cal.Rptr.2d 824] (Laidlaw), the most recent exempt from local regulation case relied on by the majority. In that case, a charter city issued a cease and desist order to a school district’s garbage company, and the city’s garbage company, in turn, sued the school district’s garbage company for declaratory and injunctive relief. (Id. at p. 634.) The court cited to Hall for the proposition that the “ ‘public schools of this state are a matter of statewide rather than local or municipal concern,’ ” and to Del Norte for the proposition that “[s]tate agencies, including school districts, enjoy immunity from local regulation unless the state, through statute or provision of the California Constitution, has consented to waive such immunity.” (Id. at p. 635.) “Like state prisons, the public schools of this state are a matter of state, not local concern,” and “[s]pecifically, the state’s maintenance of its buildings is a sovereign activity not subject to local regulation absent legislative or constitutional consent to local regulation.” (Id. at p. 637.) The court held there was no such consent in any legislative enactment or constitutional provision, including in the state Integrated Waste Management Act of 1989. (Laidlaw, at pp. 636-637.)
The Laidlaw court also ruled, as had the court in Santa Monica, that the city’s charter city status was immaterial. “Laidlaw’s ‘home rule’ argument,” said the court, “confuses the issues of preemption and sovereign immunity. The issue in this case is not whether the City has ‘home rule’ authority over garbage collection within its city limits. Unquestionably, local governments have that authority. . . .” (Laidlaw, supra, 43 Cal.App.4th at p. 638.) However, “[t]he issue here is not preemption; the issue is whether state agencies are exempt from local trash collection regulations under the doctrine of sovereign immunity,” and 'Hall, City of Santa Ana, and Del Norte make clear state agencies are indeed immune from such local regulation absent an express legislative or constitutional waiver of that immunity.” (Ibid.)
*1130 These exempt from local regulation cases address, sometimes with a lack of analytical clarity, a number of issues, including what constitutes a municipal affair or a matter of statewide concern, sovereign immunity, and preemption. All of the cases holding that local regulations were inapplicable to the state (or a state entity) involved situations where the municipality was attempting to exert regulatory control directly over the state (or a state entity or state agent). The one contrary case, allowing local regulatory control, differed in two respects—it involved direct regulatory control of a third party (a lessee who expressly was not an agent of the state university) and it involved proprietary activity by the university (leasing its property for a circus show), rather than a governmental function.
In my view, the question before us is a more nuanced one—whether a municipality can look to a state entity to collect a general local tax imposed, not on the state entity, itself, but on third parties transacting business with the entity, and particularly where, as here, the state entity will not bear the costs of collection. I also think the line of cases addressing, specifically, the scope of municipal taxing power, is more helpful in answering this question.

The Third Party Tax Cases

While many cases have addressed the bounds of municipal taxing power, Ainsworth v. Bryant (1949) 34 Cal.2d 465 [211 P.2d 564] (Ainsworth) provides a sensible starting point for purposes of the issue before us. In Ainsworth, a liquor retailer challenged a charter city’s local sales tax, claiming it was invalid as to such retailers because liquor sales were exclusively regulated by the state. Our Supreme Court rejected the retailer’s claim, explaining that the “constitutional provision removing the licensing and regulation of the liquor business from the realm of a municipal affair to that of a matter of general state-wide concern” did not impair the “plenary power of taxation possessed by a chartered municipality as an essential attribute of its existence.” (Id. at p. 472.) The “distinction between regulation and taxation,” said the court, “has been uniformly maintained,” and the court did not discern anything in the state liquor licensing and regulatory scheme that limited the taxing power of charter cities. (Id. at pp. 472M-73.) Further, in examining the nature of the tax, the court pointed out “the subject of the [tax] under the ordinance is the transaction of sale; the purchaser or consumer is made the taxpayer, and the retailer acts only as the tax collector, responsible for remitting it to the taxing authority.” (Id. at p. 474.)
As for the recordkeeping and remittance provisions of the local sales tax ordinance, they appeared “reasonably adapted to insure the collection and proper remission of the tax” and, thus, constituted “an accounting standard coincident with the city’s taxing power rather than a regulation exclusively *1131 reserved to the state in the exercise of its police power over the liquor traffic.” (Ainsworth, supra, 34 Cal.2d at p. 476.) Indeed, said the high court, “[t]he field of taxation is replete with examples of a government entity making businesses generally its agent in tax collections and prescribing certain regulations in the accounting therefor, although such businesses are not subject to ‘regulations’ by the governmental body in any sense comparable to the use of the term, for example, in our state constitutional provision relative to the intoxicating liquor business—such as withholding taxes and social security taxes for the United States government, unemployment taxes and numerous excise taxes for the state . . . .” (Id. at p. 477.)
In my view, Ainsworth articulates two relevant points: (1) charter cities have ‘“plenary power” to impose local taxes, and (2) requirements to collect and remit a local tax are not ‘“regulation” of the collecting entity in the sense that term means control and oversight of the entity’s business. In other words, even if the state has exclusive regulatory authority over the business engaged in by the collecting entity, that entity can still be required to collect and remit a valid local tax. Ainsworth did not, however, involve the collection of a local tax by a state entity.
In Rivera v. City of Fresno (1971) 6 Cal.3d 132 [98 Cal.Rptr. 281, 490 P.2d 793] (Rivera), disapproved on another ground in Yamaha Corp. of America v. State Bd. of Equalization (1998) 19 Cal.4th 1, 9 [78 Cal.Rptr.2d 1, 960 P.2d 1031], city users of telephone, gas, and electrical services sought to invalidate a local utility tax, which was collected by the utilities. Observing that “some 40 or more cities” imposed this kind of tax (Rivera, at pp. 134-135), our Supreme Court prefatorily stated that, as a charter city, Fresno was “empowered to exercise full control over its municipal affairs, unaffected by general laws on the same subject matters and subject only to limitations found in the Constitution and the city charter” (id. at p. 135). The principal issue in the case was whether the utility tax was a statutorily prohibited local sales or use tax, and the court concluded it was not. (Id. at pp. 135-139.) The court also rejected the assertion the tax “invade[d] the field of regulation of public utilities which has been clearly preempted by the state under applicable provisions of the California Constitution.” (Id. at p. 139.) “[W]hether or not the state has occupied the field of regulation,” said the court, “cities may levy fees or taxes solely for revenue purposes, as was done by the Fresno utility users’ tax.” (Ibid.) “Further, the requirement that the utility company supplying a particular utility service collect the utility users’ tax and remit to the city does not constitute forbidden or conflicting regulation of the utility.” (Ibid.)
What seems most significant about Rivera for purposes of the instant case is its reiteration of the point made in Ainsworth, that requiring an entity to *1132 collect a valid local tax imposed on third parties does not infringe on the state’s regulatory power over that entity, nor does it “constitute forbidden or conflicting regulation” of that entity. (Rivera, supra, 6 Cal.3d at p. 139.) Rivera did not, however, address whether any of the utilities were state entities and whether, as such, they could object to collecting the local tax on sovereign immunity grounds.
In City of Los Angeles v. A.E.C. Los Angeles (1973) 33 Cal.App.3d 933 [109 Cal.Rptr. 519] (A.E.C. Los Angeles), a charter city sought to collect a gross receipts tax from an electrical contractor that did business with state entities, including local school districts. The contractor variously claimed that, as to receipts from its state contracts, the tax was tantamount to an impermissible regulation of the state’s improvement of its property and therefore it was “entitled to the state’s immunity from local regulation and taxation.” (Id. at p. 939.) “The fatal flaw in Taxpayer’s argument,” said the appellate court, “is its failure to recognize that the Los Angeles City business tax is a revenue and not a regulatory measure and that the imposition of a tax upon a contractor doing business with the state is a tax upon the contractor and not the state.” (Ibid.) Stating a “municipal taxing scheme is . . . valid unless preempted by state law or prohibited by constitutional principles” (ibid.), the court held no statute or constitutional provision preempted the city’s local tax (id. at p. 940).
The A.E.C. Los Angeles court went on to explain that “[wfliilc local ordinances may not impose a regulatory scheme upon private persons which operates to impinge upon the sovereign power of the state (Hall[, supra,] 47 Cal.2d [at p.] 183) ... , revenue measures of general application imposing a nondiscriminatory tax upon persons doing business in a state regulated activity or with the state, do not so impinge.” (A.E.C. Los Angeles, supra, 33 Cal.App.3d at p. 940.) Furthermore, “the fact that a municipal tax is imposed in a fashion which permits its ultimate economic burden to be passed on to a higher governmental unit [e.g., the contractor charges the state entity a price that recoups the local tax] does not invalidate it.” (Ibid.) The court additionally explained that the fact the contractor was required to obtain a registration certificate showing compliance with the local tax was not an impermissible “regulation” of its contracting business impinging on the state’s exclusive regulatory control of such contractors. “The document is required not to regulate but to expedite the collection of revenue.” (Ibid.) “Since no regulatory purpose is served by the questioned provisions of the Los Angeles Municipal Code and since Taxpayer as an independent contractor to the state cannot appropriate to itself the state’s immunity from local taxation,” the court concluded the city could impose its tax on receipts from state contracts. (Id. at pp. 940-941.)
*1133 In my view, A.E.C. Los Angeles makes a number of relevant points: (1) a charter city’s local tax measure is valid unless prohibited by the state constitution or preempted by conflicting state law addressing a matter of statewide concern; (2) there is a critical distinction between a tax imposed directly on the state and a tax imposed on a third party doing business with the state (including a third party doing business with the state in connection with its sovereign activity of building and maintaining its property); (3) an independent contractor does not automatically share the state’s immunity from local taxation; (4) there is a distinction (as explained in Ainsworth and Rivera) between administrative requirements that insure payment of a local tax and the state’s “regulation” of how an entity conducts its business; and (5) the fact taxation of a third party may result in an indirect burden on the state or a state entity (e.g., through a higher contract price to cover the local tax), does not invalidate the local tax.
This brings me to City of Modesto, supra, 34 Cal.App.3d 504, one of the two cases that have been at the center of the debate between San Francisco and the state universities in this case. City of Modesto involved another charter city utility tax imposed on local users of water, gas, electricity and telephone services. {Id. at p. 506.) Two irrigation districts, which were state agencies and sold electricity as well as water, were among the utilities required to collect and remit the tax. The districts did not dispute that the city had the power to impose the local tax, no doubt given Rivera, in which the Supreme Court upheld a charter city’s utility tax against statutory and preemption challenges. Rather, the districts claimed they could not be compelled to collect the tax “because the ordinance, to the extent that it applies to them, impinges on the state’s sovereignty over local entities; they assert that the collection requirement of the city ordinance is a regulation and that this regulation, if extended to state agencies, contravenes the almost universal rule . . . that the activities of the state and its agencies cannot be controlled or regulated by local entities in the absence of legislative consent.” {Ibid.) Thus, the City of Modesto court was required to address the sovereign immunity question that was neither raised nor addressed in Rivera.
The appellate court first stated the districts’ position ran counter to “the doctrine of stare decisis,” citing two California Supreme Court cases. (City of Modesto, supra, 34 Cal.App.3d at p. 506, italics omitted.) These cases held (a) irrigation districts that generate electricity are engaged in a proprietary activity in competition with other public service corporations (Yolo v. Modesto Irrigation Dist. (1932) 216 Cal. 274, 278 [13 P.2d 908] (Yolo)),[5] and (b) an *1134 ordinance requiring a utility to collect a city’s tax on users does not “constitute forbidden or conflicting regulation of the utility” (Rivera, supra, 6 Cal.3d at p. 139). (See City of Modesto, at pp. 506-507.) The court did not discuss the fact Yolo involved an irrigation district’s governmental immunity defense to a tort action or that Rivera dealt with an asserted statutory bar to the local utility tax and preemption, not sovereign immunity. Rather, the City of Modesto court simply concluded that if both of these propositions were so, “how can it be argued plausibly that the collection requirement of respondent’s ordinance, if applied to that proprietary activity, is regulation which impinges on the state’s sovereignty?” {Id. at p. 507.) The court then went on to defend its reliance on Yolo, which the districts claimed was no longer a controlling precedent. {Id. at pp. 506-508.)
Presumably, the City of Modesto court could have stopped there, but it did not. Instead, it stated: “We affirm the judgment for another reason.” (City of Modesto, supra, 34 Cal.App.3d at p. 508.) While the majority views this reason as an “alternative” rationale that is mere dicta, it is not at all clear that that is the case. While the appellate court clearly believed the combination of Yolo and Rivera provided sufficient authority to affirm, the opinion can also be read as ultimately affirming “for another reason.”
In any case, the City of Modesto’?, other reason is grounded on three points which neither the majority, nor any subsequent case, has questioned: one, a charter city’s power to “levy a utility users’ tax is a municipal affair and stems from the Constitution” (citing Cal. Const., art. XI, § 5 and Rivera, supra, 6 Cal.3d at p. 135); two, such a city “has no practical nor economical means of collecting such a tax without the cooperation of the supplier of the utility service”; and three, “[i]t is basic that the power to tax carries with it the corollary power to use reasonable means to effect its collection.” (City of Modesto, supra, 34 Cal.App.3d at p. 508.) The court, thus, concluded the charter city’s constitutionally grounded power to impose and collect a local utility tax took precedence over the irrigation districts’ state sovereign immunity. {Ibid.) “While irrigation districts may be state agencies, they are nevertheless creatures of the Legislature, and like the Legislature must submit to a constitutional mandate; the California Constitution is the paramount authority to which even sovereignty of the state and its agencies must yield.” {Ibid.) “It follows,” then, said the court, “that the collection requirement of respondent’s ordinance, though applicable to state agencies, is a reasonable exercise of the city’s constitutional power to tax for revenue purposes.” {Ibid.) The court also dismissed the districts’ assertion that collection would be a burden. “[T]he districts are merely conduits for the collection of the city’s tax; they are not liable for the tax itself or the cost of collection; the *1135 trial court has ordered the city to reimburse the districts for all costs incurred in the collection process.” (Id. at pp. 508-509.)
There is no question, then, that City of Modesto rejected a sovereign immunity defense raised by state entities to collecting a local tax imposed not on the entities, themselves, but on third parties doing business with the state entities.
While the majority views City of Modesto’s holding as limited to its stare decisis rationale, which, in turn, points out the utility tax was imposed on third parties in connection with a proprietary activity (the irrigation districts’ sale of electricity), I am not persuaded the court’s stare decisis rationale is necessarily its holding. It appears equally plausible to me that the court ultimately grounded its affirmance on its power-to-tax-includes-power-to-collect rationale, which makes no mention of any distinction between a state entity’s proprietary activity and governmental function when it comes to a general tax imposed on third parties. Indeed, if a general local tax cannot be imposed on third parties in connection with an activity within a state entity’s governmental function and for which it charges a fee, then the problem in the instant case is not merely one of collection, but rather, it is the validity of the tax, itself, as to such third parties. And if that were the case, then third parties doing business with the state in connection with any governmental function (and who are not agents of the state) would essentially ‘“share” the state’s sovereign immunity from local taxation, a proposition seemingly rejected in A.E.C. Los Angeles, supra, 33 Cal.App.3d at pages 939-940.
The majority also distinguishes City of Modesto on the ground the irrigation districts were legislatively created state entities, whereas the instant case involves state universities whose existence is rooted, in varying degrees, in our state Constitution. However, the sovereignty of any state entity, be it created by Constitution or by statute, is, at its core, derived from the sovereignty of the State of California. Thus, while it is true the Regents is largely an independent entity (a “ ‘ ‘“public trust” ’ ” that has been characterized as a “‘ “ ‘branch of the state itself’ ” ’ ” (Goldbaum v. Regents of University of California (2011) 191 Cal.App.4th 703, 709 [119 Cal.Rptr.3d 664])), its sovereignty derives from that of the state as imparted to it by the state Constitution[6] (Goldbaum, at p. 709 [the Regents is ‘“not entirely autonomous” and ‘“[t]he Legislature may regulate the Regents’ conduct in *1136 three areas”]).[7] The Legislature, another branch of the state, also gives effect to the state’s sovereign immunity, including waiving it as it sees fit. (See Razeto v. City of Oakland (1979) 88 Cal.App.3d 349, 352 [151 Cal.Rptr. 791] [after Supreme Court ‘“eliminated” sovereign immunity, the Legislature commissioned study ‘“to develop legislation insuring the preservation of necessary sovereign immunity”].) State districts and agencies, in turn, like the California State University, also share in the state’s sovereign immunity, as afforded to them by the state Legislature. (See Lofchie, supra, 229 Cal.App.4th at pp. 248-250 & fn. 6; Western Title Guar. Co. v. Sacramento & San Joaquin Drainage Dist. (1965) 235 Cal.App.2d 815, 820 [45 Cal.Rptr. 578].) Indeed, the City of Modesto court made no distinction between the state Legislature and the irrigation districts in terms of their sovereign immunity. The districts, said the court, “like the Legislature must submit to a constitutional mandate,” namely, a charter city’s ‘“constitutional power to tax for revenue purposes.”[8] (City of Modesto, supra, 34 Cal.App.3d at p. 508, italics added.)
In any case, given the fundamental points undergirding City of Modesto’% power-to-tax-includes-power-to-collect rationale, I think City of Modesto has greater significance than the majority credits. In my view, that court properly concluded the state’s sovereign immunity is not impinged by (or, as the court phrased it ‘“must yield” to) an otherwise valid exercise of a charter city’s constitutionally secured power to tax—a power that ‘“necessarily includes” the ability to use reasonable means to collect, at least where the city reimburses the state entity’s collection costs, as San Francisco represents it will do here.
Moving on from City of Modesto brings me to Oakland Raiders v. City of Berkeley (1976) 65 Cal.App.3d 623 [137 Cal.Rptr. 648] (Oakland Raiders). In that case, a National Football League team that played at the University of California at Berkeley’s stadium, sued the city, claiming its local license tax based on gross receipts was a ‘“regulatory rather than a revenue-raising measure” and, thus, was ‘“an improper regulation” of the university’s use of its property. (Id. at p. 626.) While recognizing that the Regents ‘“is not subject to local regulations with regard to its use or management” of its property, *1137 citing Hall, the appellate court explained, as prior cases had done, that “ ‘[w]hether or not the state law has occupied the field of regulation, cities may tax businesses carried on within their boundaries . . . ” (Id. at pp. 626-627.) “A tax upon the operation of a business by a lessee of publicly owned property constitutes a tax upon the privilege of performing the business rather than a tax upon the property.” {Id. at p. 627.) And where one operating under a government contract or lease is taxed like any other contractor or lessee, “ ‘there is no sufficient ground,’ ” said the court, “ ‘for holding that the effect upon the Government is other than indirect and remote,’ ” quoting Helvering v. Producers Corp. (1938) 303 U.S. 376, 386-387 [82 L.Ed. 907, 58 S.Ct. 623] (Helvering).[9] (Oakland Raiders, at p. 627.) Moreover, “the fact that a tax may constitute an indirect burden upon an organ of government does not invalidate the tax.” {Ibid.) Nor does the “mere fact that a [local] tax has a collateral effect of regulating an activity” conducted on public property. {Id. at p. 628.)
Oakland Raiders, thus, reaffirmed several points being developed in the line of cases dealing directly with the interplay of municipal taxing power and the state’s sovereignty, including that (1) taxing a third party contracting with a state entity is fundamentally different from taxing a state entity, itself; (2) a local tax of general application imposed on a third party is not a “regulatory scheme” interfering with the state’s regulatory authority over its own property or over the third party’s business activities; and (3) the fact a local tax on a third party may impose an indirect burden on the state, or have a collateral regulatory effect on a third party’s use of state property, does not invalidate the local tax.
The majority discounts Oakland Raiders as embracing the regulatory versus tax distinction subsequently rejected by our Supreme Court in California Federal. But that is not the case. As I shall discuss more fully, California Federal addressed a different problem—the dual preemption analyses that had developed in the Courts of Appeal, depending on whether a challenged local ordinance was a tax or a regulatory measure, and which essentially had made local tax measures inviolable as against a preemption challenge. (California Federal, supra, 54 Cal.3d at pp. 13-18.) Indeed, a comparison of *1138 the fundamental taxation principles relied on in Oakland Raiders, and the preemption principles explicated in California Federal, shows the cases involved different issues and reached conclusions that are not at odds with one another.
Our Supreme Court took up the issue of local taxation of third parties again in Weekes, supra, 21 Cal.3d 386. In that case, individuals employed within the bounds of a charter city challenged an “ ‘employee license fee’ ”—or a “privilege tax” (id. at pp. 390, 395)—imposed by the city on the “ ‘privilege of engaging in or following any business, trade, occupation or profession as an employee’ ” (id. at p. 390). In the vernacular, this kind of tax was called a “ ‘commuter tax,’ ” designed to insure individuals working, but not residing, in a city pay some share of the cost of municipal services. (Id. at p. 413 (dis. opn. of Thompson, J.).) The individuals claimed the tax was, in actuality, a statutorily prohibited local income tax. (Id. at p. 390.) The city disagreed and further maintained that even if the tax was an income tax, its constitutionally secured taxing power could not be infringed by the state Legislature. (Id. at pp. 390-391.) The Supreme Court concluded the city’s revenue measure was not an income tax and, thus, did not reach the issue of whether the statute impermissibly constrained the city’s home rule powers.
At the end of its opinion, the high court “also conclude[d]” the city was “not barred from imposing its license tax upon state employees who work within the city,” citing to Graves v. N. Y. ex rel. O’Keefe (1939) 306 U.S. 466, 486-487 [83 L.Ed. 927, 59 S.Ct. 595] (Graves). (Weekes, supra, 21 Cal.3d at p. 398.) In Graves, the United States Supreme Court held intergovernmental tax immunity did not bar states from imposing an income tax on federal workers. The court did not consider whether the federal government could refuse, on sovereign immunity grounds, to collect and remit an otherwise permissible state income tax.
The city ordinance upheld in Weekes, however, in addition to taxing individuals working within the city, “require[d]” employers, which included the state, to withhold the tax from employee wages. (See Weekes, supra, 21 Cal.3d at p. 398.) The majority does not view this fact as being of any note, pointing out the state was not a party in Weekes and the state can waive its sovereign immunity. That is true. But upholding the local tax as to state employees would have been pointless if the city could not expect the tax to be collected by the state. Thus, in my view, Weekes at least inferentially suggests that collecting a valid local tax is not an impingement of the state’s sovereignty. It also suggests third parties can be taxed in connection with their participation in a governmental function, as some of the state employees taxed by the city in Weekes must have been delivering services within the state’s governmental function. In short, I cannot square the result in Weekes— *1139 the state collecting a valid local tax imposed on its own employees—with the majority’s conclusion, here, that the state universities need not collect a valid parking tax imposed on third parties, even though the schools will be reimbursed their costs of collection.
The next legal decision of note is an Attorney General opinion concluding a charter city could require the state park system’s agent operating the Asilomar conference center to collect a local occupancy tax from those using the center. (65 Ops.Cal.Atty.Gen., supra, at pp. 269-271.) The Attorney General recognized that ordinarily the state and its agents are exempt from taxation unless the Legislature consents, but the tax in question was “an excise tax upon the occupant and not upon the proprietor.” (Id. at p. 269.) Thus, the “sole issue” was whether “the state or its agent may be required to collect the tax for and on behalf of the city.” (Ibid., fn. omitted.) The Attorney General concluded this was permissible, citing to City of Modesto and specifically to the appellate court’s power-to-tax-includes-power-to-collect rationale. (Id. at pp. 270-271.) The Attorney General did not discuss whether the state was engaged in a proprietary activity or a governmental function, and this might well have presented a close question given that Asilomar was built as a contemplative retreat and was substantially gifted to the state to preserve its iconic character and continue as a “ ‘Refuge by the Sea.’ ” (Asilomar Conference Grounds, Park History <http://www.visitasilomar.com/ discover/park-history/> [as of May 25, 2017].)[10],[11]
*1140 This brings me to California Federal, supra, 54 Cal.3d 1, in which our Supreme Court rectified what had become an overly indulgent view of charter city taxing power vis-a-vis conflicting state enactments. In that case, a charter city sought to collect an annual license fee from a financial corporation, which, by statute, was subject to a state income tax in lieu of any other taxes and license fees. {Id. at p. 6.) The trial court ruled the taxation of such corporations was a matter of statewide concern and the city’s tax was, therefore, preempted as to such corporations. The Court of Appeal, following a trend that had developed in the appellate courts, reversed, ruling charter city “tax measures” are “municipal affairs” and “invariably are immune from state legislative supremacy.” {Ibid.)
The Supreme Court reversed, rejecting the notion that in considering a preemption claim there is any distinction between local “regulatory” and local “tax measures.” (California Federal, supra, 54 Cal.3d at pp. 13-14 [to extent courts had “made charter city powers of taxation forever sacrosanct” leading the courts of appeal “to fracture” municipal affairs into “two halves” (i.e., revenue and regulatory matters), that “duality” was “illusory”]; id. at p. 15 [“we find no reason in any policy underlying the municipal home rule provision why the subject of charter city taxation should merit treatment different from charter city regulatory measures”].) Whether a regulatory or tax measure, the fundamental inquiry as to preemption concerns the “limits on a charter city’s sovereignty.” {Id. at p. 13.) Accordingly, the problem before the high court was “that of adjusting the conflict between the effects of the City’s business license tax and the Legislature’s asserted interest in the uniform taxation of commercial banks and financial corporations.” {Id. at p. 15.)
Our Supreme Court then set forth the proper approach for resolving true conflicts between state laws and otherwise permissible charter city enactments. (California Federal, supra, 54 Cal.3d at pp. 16-18.) “[A] court asked to resolve a putative conflict between a state statute and a charter city measure initially must satisfy itself that the case presents an actual conflict . . . .” {Id. at p. 16.) If it does, the court must then make the “bedrock” determination of whether the state statute addresses a matter of “statewide concern.” {Id. at p. 17.) In making that determination, the court “should avoid the error of ‘compartmentalization,’ that is, of cordoning off an entire area of governmental activity as either a ‘municipal affair’ or one of statewide *1141 concern.” (Ibid.) Rather, what the court must determine is whether ‘“the state has a more substantial interest in the subject than the charter city.” (Id. at p. 18.)
Thus, ‘“[wjhen a court invalidates a charter city measure in favor of a conflicting state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city.” (California Federal, supra, 54 Cal.3d at p. 18.) After canvassing the history of the state’s control of financial institutions, the high court concluded the statute at issue concerned a matter of statewide concern and, as to financial corporations, took precedence over the city’s local tax. (Id. at pp. 18-24.)
In my view, the Supreme Court’s preemption analysis set forth in California Federal—which applies to any local ordinance, regardless of whether it is a local tax or regulatory measure—is not inconsistent with the court’s earlier rulings in Rivera and Ainsworth that the imposition and collection of local taxes is not impermissible ‘“regulation” in conflict with the state’s sovereign regulatory authority. (Rivera, supra, 6 Cal.3d at p. 139; Ainsworth, supra, 34 Cal.2d at pp. 472-73; see Oakland Raiders, supra, 65 Cal.App.3d at pp. 626-628; City of Modesto, supra, 34 Cal.App.3d pp. 506-507; A.E.C. Los Angeles, supra, 33 Cal.App.3d at pp. 939-940.) Indeed, the high court expressly distinguished Ainsworth as holding that the state’s exclusive regulatory control of liquor sales did not foreclose the local taxation of third parties or collection of such a tax by regulated entities. (California Federal, supra, 54 Cal.3d at p. 14, fn. 12.)
There is no question that under California Federal a local tax imposed on a third party (and its collection) is preempted if there is an actual conflict with state law and that law addresses a matter of statewide concern. However, there is no such issue here, as the parties have assumed the city’s local parking tax is valid for purposes of the universities’ sovereign immunity claim. Rather, the issue here is whether the state universities can be asked to collect the local tax from third parties, particularly where their costs of doing so will be reimbursed.
In Eastern Mun. Water, supra, 31 Cal.App.4th 24, a municipal water district that provided water and sewer services to city residents refused to collect a local tax on those services. (Id. at pp. 26-27) The water district, a state entity, did not claim the local ordinance impinged on state sovereignty, but ‘“only that there was no statute” authorizing general law cities to require collection of a local tax. (Id. at p. 30.) The appellate court nevertheless discussed City of Modesto at some length. (Id. at p. 29.) This included *1142 paraphrasing that court’s discussion of Yolo, supra, 216 Cal. 274, as concluding “irrigation districts such as appellants [are] engaged in proprietary activity.” (Eastern Mun. Water, at p. 29.) In fact, City of Modesto did make such a blanket statement, but said that in providing electricity, irrigation districts engage in a proprietary activity. (City of Modesto, supra, 34 Cal.App.3d at pp. 506-507.) This paraphrase also ignored that the district before the Eastern Mun. Water court was a municipal water district whose governmental functions are to provide water and sewer services directly to city users. (Wat. Code, §§ 71610 [authorizing water districts to supply water], 71670 [authorizing water districts to construct and operate sewage facilities].)
In any case, the appellate court relied on the principles undergirding City of Modesto’s power-to-tax-includes-power-to-collect rationale to conclude that even a general law city can look to a state water district to collect a local utility tax. “The authorities are uniform in concluding that ‘the city’s power to levy such tax would include the power to use reasonable means to effect its collection . . . .’ ” (Eastern Mun. Water, supra, 31 Cal.App.4th at p. 30, quoting Ainsworth, supra, 34 Cal.2d at p. 476.) The court also looked to several federal cases, quoting one to the effect that reserving the power to tax also includes reserving the power to collect, as “ ‘[t]he former without the latter would be an empty gesture.’ ” (Eastern Mun. Water, at p. 31, quoting Rainier National Park Co. v. Martin (W.D.Wn. 1937) 18 F.Supp. 481, 488, affd. (1938) 302 U.S. 661 [82 L.Ed. 511, 58 S.Ct. 478].)
The majority distinguishes Eastern Mun. Water as involving only an issue of statutory construction, pointing out the water district did not raise sovereign immunity. That is true. Nevertheless, Eastern Mun. Water is significant for two reasons. First, it reaffirmed the fundamental principles underlying City of Modesto’s power-to-tax-includes-power-to-collect rationale. Second, there can be no doubt that in providing water and sewer services to city residents, the water district was performing governmental functions—yet, it was still required to collect the city’s local tax on those services. Thus, I also cannot square the result in Eastern Mun. Water—that state water districts are required to collect a local tax imposed on third parties in connection with their governmental functions—with the majority’s conclusion, here, that the state universities need not collect a local parking tax imposed on third parties in connection with a governmental function, and even though the schools will be reimbursed their costs.
Finally, I arrive at Bame, supra, 86 Cal.App.4th 1346, which is the other principal case, in addition to City of Modesto, on which the parties have focused, and which the majority says rejects City of Modesto’s power-to-tax-includes-power-to-collect rationale and supports the result it reaches here. In Bame, a charter city sought to collect a license fee and an admissions tax in *1143 connection with certain events conducted under contract for the “ ‘state institution’ ” (the district) that conducts the Del Mar Fair and also leases its property to the Del Mar Thoroughbred Club for horse racing. {Id. at p. 1351.) Event operators eventually began to refuse to pay the license fee and admissions tax, and the city sued the district seeking a declaration that its local revenue raising measures were valid. {Id. at pp. 1353-1354.) The district, claiming its contractors were extensions of itself and thus were imbued with its state sovereignty, raised several defenses, including sovereign immunity and preemption. {Id. at pp. 1354-1355.) The city maintained, in turn, that its revenue raising measures were a valid exercise of its constitutional home rule power to tax and, in any case, the district, in contracting with the event operators, was acting “in a ‘proprietary’ as opposed to its governmental capacity.” {Id. at p. 1355.)
Citing extensively to Laidlaw, supra, 43 Cal.App.4th 630, which, as discussed, had concluded a local school district could not be required to use a charter city’s garbage collector, the Batne court stated “[i]n determining whether the District’s contractors are exempt from local regulations under the doctrine of sovereign immunity, the relevant inquiry is whether the District acts within its governmental capacity in contracting with these entities.” (Bame, supra, 86 Cal.App.4th at p. 1355.) And, like Laidlaw, the Batne court explained the city’s charter city status “is not pertinent to this analysis.” {Id. at pp. 1355-1356.) “The issue of sovereign immunity,” reiterated the Batne court, “is distinct from that of preemption. . . . ‘[SJtate agencies are indeed immune from . . . local regulation absent an express legislative or constitutional waiver of that immunity.’ ” {Id. at p. 1356, quoting Laidlaw, at pp. 638-639.) As for the distinction between proprietary and governmental activity, while it is “no longer applicable to determine governmental tort liability,” the Batne court agreed it “remains viable in the context of encroachment of municipal regulations.” (Bame, at p. 1356.)
Looking to the district’s statutorily authorized purposes and activities, which included promoting and featuring “ ‘all of the industries and industrial enterprises, resources and products of every kind or nature of the state,’ ” the Batne court concluded that “[g]iven the broad functions and authority granted to the District, ... its sovereign immunity extends to those private entities with which it leases or contracts in order to put on consumer product exhibitions and shows.” (Bame, supra, 86 Cal.App.4th at pp. 1357-1358, italics omitted.) The court next concluded the state had not expressly agreed to the city’s licensing fee and admissions tax. {Id. at pp. 1359-1361.) Accordingly, the court invalidated the city’s ordinance to the extent it imposed “a license fee on entities contracting with the District to put on consumer shows,” as it taxed “the District’s sovereign activities.” {Id. at p. 1362, italics added.)
*1144 The problem with using Bame as an analytical guidepost is its lack of clarity as to the nature of the disputed license fee and admissions tax. Most of its language characterizes the fee and tax as imposed on the district’s agents (and, thus, effectively, on the district, itself). (E.g., Bame, supra, 86 Cal.App.4th at p. 1351 [Bame, one of the contractors, “sought a refund of fees and taxes paid to the City”]; id. at p. 1352 [“It is undisputed that the admissions tax is ‘paid 100% by contractors who put on events at [the] Del Mar Fairgrounds.’ ”]; id. at p. 1353 [Bame “alleged that up until 1997 he paid the City a 10 percent admissions tax for conducting his home and garden show”]; id. at pp. 1361-1362 [the provisions of certain horse racing statutes “do not constitute express consent by the state to taxing or regulation of the District or its contractors by the City”; thus, “as applied to permit the City to impose an admissions tax on the entities contracting with the District to put on consumer shows, [Del Mar Municipal Code,] section 3.08.010 of the ordinance taxes the District’s sovereign activities and is invalid and unenforceable”].)
However, other language in Bame suggests there was, in fact, a distinction between the license fee and the admissions tax, namely that the former was imposed directly on the event operators (and thus, effectively, directly on the district), while the latter was imposed on those attending events, but was collected by the contractors. For example, the appellate court quoted verbatim an admission by the City of Del Mar that limited the case to contractors putting on nonhorse racing events—a significant narrowing of the case. (Bame, supra, 86 Cal.App.4th at p. 1355.) That admission was as follows: “The City maintains it ‘does not impose a business license requirement on the District or the Del Mar Thoroughbred Club, the association which conducts horse racing and satellite wagering. Nor does the City impose admissions taxes on patrons of the racetrack or the Del Mar Fair.’ Given these admissions ... we do not address the validity of the ordinance to the extent it arguably permits the City to tax or impose fees upon the District itself or Del Mar Thoroughbred Club patrons . . . .” (Ibid.) This quoted statement by the city suggests that while the city’s licensing fee was, indeed, imposed directly on the district’s contractors, its admissions tax was actually imposed on patrons, with the contractors liable for its collection.[12]
In any case, the Bame court did not identify any such distinction between the disputed licensing fee and admissions tax, but treated both as though they were imposed on the district’s agents (and, thus on the district, itself). Given that view of the local revenue measures, the result Bame reached—that, *1145 regardless of its charter status, the city could not impose the fee and tax on the district’s agents—is indisputably correct, as no state entity can, itself, be subject to a local tax unless it consents. Given that view of the revenue measures, however, Barne does not address the issue before us—whether a state entity can be required to collect a general local tax imposed not on the entity, itself, but on third parties doing business with the entity. Thus, contrary to the majority’s view, Barne does not reject City of Modesto or any other third party taxation or collection case—in fact, Barne makes no mention of any of these cases. Nor does Barne support the result reached by the majority in this third party case.

Reconciling the Exempt from Local Regulation and Third Party Tax Cases

As the foregoing recitation of the exempt from local regulation and the third party tax cases reflects, I am unable to subscribe to the majority’s view—that collection of the city’s parking tax would constitute impermissible regulation of the state universities’ use and maintenance of their property— for several reasons. It disregards the distinction consistently made in the third party tax cases between a local tax imposed on a state entity and a general tax imposed on a third party doing business with the entity. (See Eastern Mun. Water, supra, 31 Cal.App.4th at p. 26 [utility tax on third parties]; Oakland Renders, supra, 65 Cal.App.3d at pp. 626-628 [license tax on third parties]; City of Modesto, supra, 34 Cal.App.3d at p. 506 [utility tax on third parties]; A.E.C. Los Angeles, supra, 33 Cal.App.3d at p. 939 [gross receipts tax on third parties]; see also Weekes, supra, 21 Cal.3d at pp. 390-391 [privilege tax imposed on third parties]; Rivera, supra, 6 Cal.3d at p. 135 [utility tax on third parties]; cf. Bame, supra, 86 Cal.App.4th at pp. 1361-1362 [characterizing local fee and tax as “on” district’s agents].) It disregards the uniform view in the third party tax cases that such a tax does not impermissibly invade the state’s exclusive regulatory authority over a collecting entity or a third party (see Rivera, at p. 139; Ainsworth, supra, 34 Cal.2d at p. 472), nor does it constitute impermissible regulation of the state’s use of its own property. (See Oakland Raiders, at pp. 627-628; City of Modesto, at pp. 506-507.) And it disregards the authority upholding local taxes imposed on third parties doing business with the state, even in connection with the performance of a governmental function (see Weekes, at p. 398 [upholding local privilege tax on state employees]; A.E.C. Los Angeles, at pp. 939-941 [upholding local gross receipts tax on contractor working on local school projects]), as well as the authorities requiring state entities to collect valid local taxes, including taxes on services within an entity’s governmental function (see Eastern Mun. Water, at p. 30 [water district required to collect local utility tax on water and sewer services]; cf. 65 Ops.Cal.Atty.Gen., supra, at pp. 270-271 [state’s agent required to collect local occupancy tax on use of Asilomar]; cf. Weekes, at p. 398 [upholding local ordinance imposing tax on all employees, including state employees, that required employers to collect tax]). In fact, a *1146 number of these third party tax cases explain why Hall’s not-subject-to-local-regulation rationale does not apply. (See, e.g., Oakland Raiders, at p. 626; A.E.C. Los Angeles, at p. 940.)
Accordingly, in my view, the principles undergirding the City of Modesto’s power-to-tax-includes-power-to-collect rationale more appropriately resolves the question of a state entity collecting a valid local tax imposed on third parties, particularly where, as here, the state entity will be reimbursed its costs of collection and, thus, will serve as a “mere[] conduit[]” of the tax. (City of Modesto, supra, 34 Cal.App.3d at p. 508.) As our Supreme Court observed in California Federal, “the power to levy local taxes in support of local expenditures is an essential function of municipal government.” (California Federal, supra, 54 Cal.3d at p. 13; see Ainsworth, supra, 34 Cal.2d at p. 472 [the “plenary power of taxation possessed by a chartered municipality [is] an essential attribute of its existence”].) And as the appellate courts in Eastern Mun. Water and City of Modesto pointed out, that power is illusory without the power to collect. (Eastern Mun. Water, supra, 31 Cal.App.4th at p. 30; City of Modesto, at p. 508.) There is no question that requiring a state entity to collect a local tax brings the respective sovereign spheres of the state and a municipality within harrowingly close proximity. Nevertheless, it is “the difficult but inescapable duty of the court to, in the words of one authoritative commentator, ‘allocate the governmental powers under consideration in the most sensible and appropriate fashion.’ ” (California Federal, at p. 17.)
I find support for a more nuanced view of sovereign immunity—that it is not impinged by collecting a general local tax imposed on third parties, particularly where the costs of such are reimbursed—not only in the principles developed in the third party tax cases, but also in federal tax cases (which our appellate courts have cited as supporting authority in a number of the third party tax cases).
The United States Supreme Court has addressed competing sovereignty claims over taxation in two contexts—disputes between states and the federal government, and between federally recognized Indian tribes and the states. While the source and nature of sovereign immunity attendant to the federal government, the states, and recognized Indian tribes differs, as far as taxation within their respective jurisdictional spheres is concerned, each is recognized as a sovereign, with the power and dignity that imports. (See, e.g., Washington v. Confederated Tribes (1980) 447 U.S. 134, 152, 154 [65 L.Ed.2d 10, 100 S.Ct. 2069] (Colville) [“power to tax transactions occurring on trust lands ... is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status”; “even if the State’s interests were implicated by the tribal taxes ... it must be remembered that tribal sovereignty is dependent on, and *1147 subordinate to, only the Federal Government, not the States”]; Graves, supra, 306 U.S. at pp. 477-478 [“The theory of the tax immunity of either government, state or national, and its instrumentalities, from taxation by the other, has been rested upon an implied limitation on the taxing power of each, such as to forestall undue interference, through the exercise of that power, with the governmental activities of the other.”]; Helvering v. Gerhardt (1938) 304 U.S. 405, 411-422 [82 L.Ed. 1427, 58 S.Ct. 969] [discussing evolution of implied constitutional intergovernmental tax immunity].) Thus, while I have no quarrel with the majority’s point that federal and state sovereign immunity differ, and that tribal sovereign immunity differs from both federal and state sovereign immunity, when it comes to the power to tax third parties within their jurisdictional borders, the sovereign power of all three is on fairly even footing.
The United States Supreme Court has consistently reaffirmed that one sovereign cannot directly tax another sovereign with respect to its governmental functions. (See, e.g., United States v. County of Fresno (1977) 429 U.S. 452, 459 [50 L.Ed.2d 683, 97 S.Ct. 699] [“[s]ince M’Culloch [v. Maryland (1819) 17 U.S. 316], this Court has adhered to the rule that States may not impose taxes directly on the Federal Government”].) It also has repeatedly held, however, that a generally applicable tax imposed by one sovereign on third parties doing business with another sovereign, does not impinge on the latter’s immunity, even if the tax indirectly imposes additional costs on the nontaxing sovereign. (See County of Fresno, at p. 462 [“The rule to be derived from the Court’s more recent decisions” is that “the economic burden on a federal function of a state tax imposed on those who deal with the Federal Government does not render the tax unconstitutional so long as the tax is imposed equally on the other similarly situated constituents of the State.”]; Helvering v. Gerhardt, supra, 304 U.S. at pp. 421-424 [upholding power of federal government to impose income tax on state employees; “[t]he mere fact that the [indirect] economic burden of such taxes may be passed on to a state government . . . infringes no constitutional immunity”].)
The Supreme Court’s reasoning in these tax-imposition cases, at bottom, has been that tax revenues are the lifeblood of every sovereign, and sovereigns with overlapping jurisdiction must therefore bear the indirect consequences, including increased costs, necessarily associated with each other’s revenue raising measures. (See Graves, supra, 306 U.S. at p. 483 [implied constitutional immunity from taxation is narrowly construed because “the expansion of the immunity of the one government correspondingly curtails the sovereign power of the other to tax”].) “The state and national governments must co-exist. Each must be supported by taxation of those who are citizens of both.” (Helvering v. Gerhardt, supra, 304 U.S. at p. 422.)
*1148 While this body of federal cases has consistently upheld taxes imposed by one sovereign on third parties within the overlapping jurisdiction of another sovereign, it has not addressed one sovereign’s efforts to persuade another to collect a duly imposed tax. Moreover, as between the federal government and the states, collection has largely been dealt with by way of statute and reciprocal agreement. (See, e.g., 5 U.S.C. §§ 5517, 5520 [authorizing Secretary of the Treasury to enter into tax withholding agreements for state and local taxes].)[13]
However, the United States Supreme Court has dealt with sovereignty issues associated with the collection of taxes in the context of state efforts to require federally recognized Indian tribes to collect state taxes. The high court has brought the same pragmatic view to this context that has driven its tax-imposition cases—that to insure the mutual survival of sovereigns with overlapping jurisdiction, their respective sovereign immunity necessarily must have some degree of fluidity. Thus, in a series of cases the court repeatedly rejected sovereign immunity defenses by tribes against state efforts to require them to collect state sales taxes. (See, e.g., Oklahoma Tax Comm’n v. Potawatomi Indian Tribe (1991) 498 U.S. 505, 513 [112 L.Ed.2d 1112, 111 S.Ct. 905] (Oklahoma Tax Comm ’n) [“the doctrine of tribal sovereign immunity does not prevent a State from requiring Indian retailers doing business on tribal reservations to collect a state-imposed cigarette tax on their sales to nonmembers of the Tribe”];[14] Colville, supra, 447 U.S. at p. 151 [“And the State may impose at least ‘minimal’ burdens on the Indian retailer to aid in enforcing and collecting the [state] tax.”]; Moe v. Salish & Kootenai Tribes (1976) 425 U.S. 463, 483 [48 L.Ed.2d 96, 96 S.Ct. 1634] [burden of collecting state tax would not “frustrate[] tribal self-government”].) Indeed, Justice Rehnquist observed in his concurring and dissenting opinion in Colville, “[i]f Indians are to function as quasi co-sovereigns with the States, they like the States, must adjust to the economic realities of that status as *1149 every other sovereign competing for tax revenues . . . .” (Colville, supra, 447 U.S. at p. 186 (conc. & dis. opn. of Rehnquist, J.).)
The majority dismisses these federal cases as having nothing to do with the state universities’ sovereign immunity, let alone the principle that a state entity is exempt from local regulation of its governmental functions. Certainly, federal and state intergovernmental tax immunity, and tribal sovereign immunity, differ from the state’s exemption from local regulation as developed by the California courts. But this misses the bigger picture—that the United States Supreme Court’s pragmatic view that sovereign immunity is not impinged by a minimal burden associated with the collection of another sovereign’s lawful tax, is essentially the view reflected by City of Modesto's the-power-to-tax-includes-the-power-to-collect rationale.
In my view, this is also the approach that best accommodates the respective sovereign interests of the state and of municipalities in connection with a general local tax imposed on third parties doing business with a state entity. Under this approach, it does not matter whether that business is arguably within the sphere of a state entity’s governmental function (particularly given the current expansiveness of that term (see, e.g., Bame, supra, 86 Cal.App.4th at p. 1358)). What is significant is whether it is a general tax imposed on third parties doing business with the state entity, particularly where, as here, the entity will bear no costs of collection. Accordingly, in my view, the state universities can be required to collect the city’s parking tax from those paying to park in their parking lots.
Appellant’s petition for review by the Supreme Court was granted September 13, 2017, S242835.

 I have not included Bame v. City of Del Mar (2001) 86 Cal.App.4th 1346 [104 Cal.Rptr.2d 183] (Bame). in this litany because, as I shall discuss, the appellate court, in bailing enforcement of two local revenue measures, treated the challenged fee and tax as imposed on the state entity, itself.

 San Francisco has expressly stated it is not seeking to compel the universities to comply with the administrative and regulatory provisions of its parking tax ordinance, nor is it seeking to subject the universities to the ordinance’s penalty provisions. While the universities have objected to this representation by the city, there is no impediment to the city limiting, or abandoning portions of, the writ relief it seeks. (See S.F. Bus. & Tax Regs. Code, § 6.23-1 [provisions of parking tax ordinance are severable]; City of Modesto, supra, 34 Cal.App.3d at p. 509 [suggesting severable penalty provision of local utility tax ordinance might not be enforceable against state entity, but declining to reach issue].)

 I discuss the exempt from local regulation cases and the third party tax cases separately because they involve different factual scenarios and discuss different legal principles, as the following overview of these cases makes clear. This in no way contradicts our Supreme Court’s holding in California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1 [283 Cal.Rptr. 569, 812 P.2d 916] (California Federal), that no distinction is to be drawn between local tax measures and local regulatory measures when engaging in a preemption analysis. As the majority states, there is no preemption issue before us. Rather, the issue here is whether requiring the state universities to collect the city’s general parking tax imposed on third parties would impermissibly impinge on the schools’ sovereignty, and specifically on their' control and maintenance of their property.

 While I have no quarrel with the majority’s observation that sovereign immunity often is interposed as a legal defense to a damages lawsuit, I do not agree with its suggestion that the state’s exemption from local regulation of its governmental functions is merely a judicially created “doctrine” and not a consequence of the state’s sovereignty. Rather, in my view, the state is exempt from local regulation of its governmental functions, unless it consents thereto, because of its sovereign status.

 The appellate court did not address the fact the utility tax also applied to water service, even though that would seemingly have been within the districts’ governmental function. The irrigation districts may have supplied water only to municipal water districts, however, and not directly to city users.

 “The University of California was originally a corporation, with the Regents as its board of directors.” (People v. Lofchie (2014) 229 Cal.App.4th 240, 248, fn. 5 [176 Cal.Rptr.3d 579] (Lofchie).) After controversy arose between political factions seeking to control the university’s governance and curriculum, it was given constitutional stature to promote academic independence. (Ibid.)

 In nearly all other respects, the Regents has a “ ‘general immunity from legislative regulation.’ ” (Lofchie. supra. 229 Cal.App.4th at p. 249, quoting San Francisco Labor Council v. Regents of University of California (1980) 26 Cal.3d 785, 788 [163 Cal.Rptr. 460, 608 P.2d 277].)

 Moreover, because the board of trustees of the California State University—an entity largely created, and extensively controlled, by the Legislature—is also a defendant in this case, City of Modesto cannot be distinguished on the ground it involved only legislatively created state entities. (See Lofchie. supra. 229 Cal.App.4th at pp. 248-249, fn. 6 [“In contrast [to the Regents], the Legislature possesses comprehensive powers of regulation over the California State University, which ‘ “ ‘is subject to full legislative control, and has “only such autonomy as the Legislature has seen fit to bestow.[”]’ ” ’ ”].)

 Helvering is one of the early United States Supreme Court cases examining the scope of what came to be called “intergovernmental tax immunity,” shared by the federal and state governments. In Helvering, an energy lessee claimed, among other things, that it was effectively a state instrumentality and, thus, was not subject to federal income tax. (Helvering, supra. 303 U.S. at p. 383.) The Supreme Court rejected this argument, commenting “the power to tax should not be crippled ‘by extending the constitutional exemption from taxation to those subjects which fall within the general application of non-discriminatory laws, and where no direct burden is laid upon the governmental instrumentality and there is only remote, if any, influence upon the exercise of the functions of government.’ ” (Id. at p. 385, quoting Willcuts v. Bunn (1931) 282 U.S. 216, 225 [75 L.Ed. 304, 51 S.Ct. 125].)

 Asilomar was built by the Young Women’s Christian Association commencing in 1913. Many of its buildings were designed by architect Julia Morgan, and those buildings designed by Morgan are designated national historic landmarks. (Asilomar Conference Grounds, Park History <http://www.visitasilomar.com/discover/park-history/> [as of May 25, 2017].)

 The Attorney General concluded the state park system’s lessee operating cabins and a lodge at Pfeiffer Big Sur State Park could also be required to collect a county occupancy tax. However, the Attorney General used a different analysis given that the county’s taxing authority derived largely from statute. (65 Ops.Cal.Atty.Gen., supra, at pp. 271-272.) The Attorney General invoked the principle that while the state and its agencies generally are not included within the general provisions of an authorizing statute, this exclusion only applies if their inclusion “would result in an infringement upon sovereign powers.” (Id. at p. 273.) Thus, as to the county tax, the Attorney General examined whether the Big Sur cabins and lodge were “an integral facet of’ a state park’s “exercise of sovereign power” and concluded they were not. (Id. at pp. 273-274.) Since the lodging was “operated by the state in a proprietary capacity,” the Attorney General concluded its agent could be required to collect the statutorily authorized local tax. (Id. at p. 274.) Thus, in contrast to the Attorney General’s analysis of the charter city’s occupancy tax, his analysis of the county’s tax depended on the state entity being engaged in a proprietary activity, even though the tax was a general one imposed on third parties and not on the state, itself (or on its agent).
In my view, the Attorney General’s struggle with the county tax reflects the absence of a cogent analytical template that allows the courts to evaluate the role of a state entity in collecting a general local tax imposed on third parties. Indeed, the Attorney General’s limited view of the park system’s governmental function at Big Sur is difficult to square with the *1140 generous view of governmental function more recently embraced in Bame and taken by the trial court and majority here. (Bame. supra. 86 Cal.App.4th at pp. 1356-1357.) I do not disagree with this broader view of governmental activity, but I do note that in applying intergovernmental tax immunity, the federal courts take a much narrower view of what governmental activity is immune from taxation. (E.g., New York v. United States (1946) 326 U.S. 572, 581 [90 L.Ed. 326, 66 S.Ct. 310] [upholding federal tax imposed on state in connection with its bottling and sale of mineral water].)

 The same is suggested by the language of the ordinance—that the admissions tax was actually imposed on patrons, but collected and remitted by the contractors, who were liable for the tax if they failed to collect it. (See Del Mar Mun. Code, §§ 3.08.010, 3.08.070, 3.08.080, 3.08.090.)

 Title 5 of the United States Code sections 5517(b) and 5520(b) state, among other things, that they “do[] not give the consent of the United States to the application of’ a state statute or local ordinance “which imposes more burdensome requirements on the United States than on other employers”—language which suggests a limited waiver of perceived sovereign immunity. However, I am aware of no federal case holding that, absent consent, one sovereign’s collection of another sovereign’s ordinary income tax, for example, in and of itself, impermis-sibly impinges on federal intergovernmental tax immunity. (Cf. Jefferson County v. Acker (1999) 527 U.S. 423, 441, fn. 11 [144 L.Ed.2d 408, 119 S.Ct. 2069] [majority responding to dissent’s view that local occupational tax imposed on federal judges impermissibly imposed administrative burden on federal court exceeding those associated with ordinary, permissible income tax].)

 Because tribal sovereign immunity does preclude suit against a federally recognized tribe without its consent, the court also held the state could not enforce its collection requirements in court. (Oklahoma Tax Comm’n, supra, 498 U.S. at p. 514.) While the state complained that gave it “a right [to require collection] without any remedy,” the court suggested it had other avenues to secure compliance its sales tax law. (Ibid,)